Larry JEGLEY, In His Official Capacity, and On Behalf of Himself and All Others Similarly Situated *v.* Elena PICADO, *et al.*

01–815 80 S.W.3d 332

Supreme Court of Arkansas
Opinion delivered July 5, 2002

*Mark Pryor*, Att'y Gen., by: *Jill Jones Moore*, Ass't Att'y Gen., for appellant.

*Mitchell, Blackstock, Barnes, Wagoner & Ivers*, by: *David L. Ivers* and *Emily Sneddon*; and *Lambda Legal Defense & Education Fund, Inc.*, by: *Susan L. Sommer, Ruth E. Harlow*, and *Jennifer Middleton*, for appellees.

*Kaplan, Brewer & Maxey, P.A.*, by: *Philip E. Kaplan*; and *Professor John M.A. DiPippa* (Associate's License, Commonwealth of Virginia), for *amici curiae* National Conference for Community Justice, the Right Reverend Larry E. Maze, Rabbi Eugene Levy, the Reverend Jo Ellen Willis, the Reverend Donna Rountree, More Light Presbyterians of Central Arkansas, and University of Arkansas Law Professors Donald Judges, Cynthia E. Nance, Richard B. Atkinson, and Morton Gitelman.

*Nathalie F.P. Gilfoyle* and *James L. McHugh*, for *amicus curiae* American Psychological Association.

*Carolyn I. Polowy*, for *amicus curiae* National Association of Social Workers, Inc.

*Ronald L. May* and *Jenner & Block, LLC*, by: *William M. Hohengarten* and *Nicole G. Berner*, for *amici curiae* American Psy-

chological Association, Arkansas Psychological Association, National Association of Social Workers, and the Arkansas Chapter of the National Association of Social Workers.

ANNABELLE CLINTON IMBER, Justice. This appeal involves a constitutional challenge to the Arkansas sodomy statute at Ark. Code Ann. § 5-14-122 (Repl. 1997). Appellant Larry Jegley, acting in his official capacity as prosecuting attorney for the Sixth Judicial District, on behalf of himself and all others similarly situated, was sued by appellee Elena Picado and six other gay and lesbian Arkansas citizens. Appellees seek a declaratory judgment that this state's sodomy statute is unconstitutional and an injunction against future enforcement of the statute. They assert that the statute violates their fundamental right to privacy and their equal protection rights under both federal and state constitutional law. We agree with appellees and hold that Ark. Code Ann. § 5-14-122 is unconstitutional under the Arkansas Constitution.

The statute at issue specifically provides:

> (a) A person commits sodomy if such person performs any act of sexual gratification involving:
>
> (1) The penetration, however slight, of the anus or mouth of an animal or a person by the penis of a person of the same sex or an animal; or
>
> (2) The penetration, however slight, of the vagina or anus of an animal or a person by any body member of a person of the same sex or an animal.
>
> (b) Sodomy is a Class A misdemeanor.

Ark. Code Ann. § 5-14-122. The criminal penalty range for a conviction under the statute is a sentence not to exceed one year in jail and a fine of up to $1,000. *See* Ark. Code Ann. §§ 5-4-201 and 5-4-401 (Repl. 1997).

Appellees Elena Picado, Randy McCain, Robin White, Bryan Manire, Vernon Stokay, Charlotte Downey and George Townsand filed a declaratory judgment action seeking to have Ark. Code Ann. § 5-14-122 declared unconstitutional insofar as it

criminalizes specific acts of private, consensual sexual intimacy between persons of the same sex. Appellees are long-time gay and lesbian residents of Arkansas, several of whom live with partners in long-term, committed relationships. They include a teacher, a minister, a nurse, a school guidance counselor, a small-business owner, and computer-industry employees. One is the mother of two children. All admit that they have violated the statute in the past and allege that they intend to engage in conduct prohibited by the statute in the future. As members of the class targeted by the statute, appellees contend that they are harmed by the law because it criminalizes their private, intimate conduct. They also fear prosecution for violations of the statute and claim that such prosecution could result in their loss of jobs, professional licenses, housing, and child custody. According to appellees, the statute brands them and other gay and lesbian Arkansans as criminals, singling them out for condemnation and stigma.

Appellant maintains that the sodomy statute is constitutional. He filed a motion to dismiss appellees' complaint, but the chancellor entered an order denying that motion. An interlocutory appeal to this court followed. By opinion entered June 24, 1999, we reversed and remanded the case with directions that the case be transferred to circuit court. See *Bryant v. Picado*, 338 Ark. 227, 996 S.W.2d 17 (1999) (*Picado I*). The original defendants were prosecutor Larry Jegley and then-Attorney General Winston Bryant, sued in their "official" capacities only. Mark Pryor was later substituted in place of Bryant when he assumed the office of Attorney General. The circuit court later granted Pryor's motion to dismiss, finding that Pryor did not have a nexus with enforcement of the sodomy statute. On June 12, 2000, the circuit court granted appellees' unopposed motion to certify Jegley as representative of a class of all state prosecuting attorneys sued in their official capacities.

Upon consideration of the parties' cross-motions for summary judgment, the circuit court found: (1) that appellees' claims were justiciable; (2) that the guarantees of individual liberty provided in the Arkansas Constitution offer greater protection of the right to privacy than those provided by the federal constitution as interpreted by the United States Supreme Court; (3) that Arkan-

sas's fundamental right to privacy encompasses the right of appellees to engage in consensual, private, noncommercial, sexual conduct; (4) that Ark. Code Ann. § 5-14-122 is in violation of such rights as afforded by Article 2, Section 2, of the Arkansas Constitution; and (5) that Ark. Code Ann. § 5-14-122 violates rights of equal protection as guaranteed by the Arkansas Constitution at Article 2, Section 18. Appellant now appeals from that order, filed on March 23, 2001, granting appellees' motion for summary judgment and denying appellant's motion for summary judgment.

On appeal, appellant claims the circuit court erred in holding that appellees claims establish a justiciable controversy and that, even if a justiciable controversy exists, appellees cannot overcome the presumption of the statute's constitutionality. Appellant further contends the circuit court erred in finding that the Arkansas Constitution guarantees a fundamental right to privacy encompassing homosexual sodomy; the circuit court erred in finding that the sodomy statute reflects impermissible gender-based discrimination; and the protection of public morality provides a rational basis for Arkansas's sodomy statute. Our jurisdiction is proper pursuant to Ark. Sup. Ct. R. 1-2(a)(1).

This case is before us pursuant to the circuit court's grant of summary judgment to the appellees. Summary judgment should only be granted when it is clear that there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *Hall v. Tucker*, 336 Ark. 112, 983 S.W.2d 432 (1999); *McCutchen v. Huckabee*, 328 Ark. 202, 943 S.W.2d 225 (1997). On appellate review, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of the motion leave a material fact unanswered. *Id.* The burden of sustaining the motion for summary judgment is always on the moving party and this court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Summary judgment is proper when the party opposing the motion fails to show that there is a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Id.* Our

review focuses not only on the pleadings, but also on the affidavits and other documents filed by the parties. *Id.* *See* Ark. R. Civ. P. 56 (2002).

## I. Justiciable Controversy

For his first point on appeal, appellant argues that appellees cannot seek a declaratory judgment on the constitutionality of the sodomy statute because they have not shown the existence of a justiciable controversy by way of a credible threat of imminent prosecution. In response, appellees contend they have abundantly demonstrated that they are faced with a credible threat of prosecution under the statute. They further assert that the statute's unequal treatment alone, and the stigma and collateral harms it triggers for lesbians and gay men, inflict ongoing, serious injuries long recognized as judicially cognizable. On appeal, the question as to whether there was a complete absence of a justiciable issue shall be reviewed de novo on the record of the trial court. *Stilley v. Hubbs*, 344 Ark. 1, 40 S.W.3d 209 (2001).

In *Picado I*, this court alluded to the justiciable-controversy requirement:

> As a general rule, equity jurisdiction exists only when the remedy at law is inadequate. More particularly, "equity will not entertain a contest over the validity of a statute nor restrain prosecutions pending the determination of the validity thereof where an adequate remedy at law exists." Here, Appellants argue that Appellees' remedy at law is to challenge the constitutionality of section 5-14-122 in defense of a prosecution under that statute. We disagree with Appellants' assertion that Appellees' constitutional challenge must be postponed until one or more of them is arrested and charged with violating the statute. We agree, however, that the chancery court lacks jurisdiction to hear Appellees' complaint. [Citations and emphasis omitted.]

338 Ark. at 230-31, 996 S.W.2d at 18-19. Based upon the quoted language, the circuit court found on remand that we ruled in *Picado I* that appellees' constitutional challenge did not have to be postponed until one or more of them was arrested and charged with violating the statute.

■ Appellant claims the trial court erred in its law–of–the–case ruling because the issue of justiciability was not squarely addressed or resolved by this court; rather, the *Picado I* appeal was resolved solely on the issue of the chancery court's jurisdiction. We agree. The *Picado I* opinion related solely to the issue of whether the chancery court was the proper court in which appellees should present their claims. *Clemmons v. Office of Child Support Enforcement*, 345 Ark. 330, 47 S.W.3d 227 (2001) (holding that, while a decision of the court will not be disturbed because it is law of the case under res judicata, the court is not bound by a conclusion stated as obiter dictum). In addition, we point out that appellant does not disagree with our statement in *Picado I* that appellees are not required to suffer prosecution before they can challenge the statute. In fact, appellant argued below and now maintains on appeal that either an actual prosecution or a credible threat of prosecution is required in order for a justiciable controversy to exist. We must, therefore, conclude that the trial court's law–of–the–case ruling was in error. However, we will affirm the trial court if it reached the right result, even though the court may have announced the wrong reason. *Norman v. Norman*, 347 Ark. 682, 66 S.W.3d 635 (2002); *Ouchita Trek and Develop. Co. v. Rowe*, 341 Ark. 456, 17 S.W.3d 491 (2000); *Summers Chevrolet, Inc. v. Yell County*, 310 Ark. 1, 832 S.W.2d 486 (1992).

As to the merits of the justiciable–controversy issue, appellant contends that the mere existence of Ark. Code Ann. § 5–14–122 is insufficient to support this court's adjudication of its constitutionality. He claims that, given the prosecutorial discretion in the enforcement of statutes, it is possible that the sodomy statute may never be enforced against private, consensual behavior. In support thereof, appellant references the history of nonenforcement under the statute to refute appellees' alleged fear of prosecution. He also points out that no reported Arkansas case in the past "50+ years" reveals a prosecution under the sodomy statute for private, consensual conduct violating the statute. In sharp contrast, appellees dispute these claims. Because they engage in and will continue in the future to engage in behavior criminalized by the statute, appellees take the position that they face a real and ongoing threat that they will be prosecuted as members of a class specifically

targeted by the statute. Additionally, they allege that government officials in Arkansas have relied on the statute as both a tool and a justification for discriminatory actions against homosexuals.

■ ■ Declaratory relief is the remedy sought by appellees in this case. Our statute on the right to a declaratory judgment states:

> *Any person* interested under a deed, will, written contract, or other writings constituting a contract or *whose rights, status, or other legal relations are affected by a statute*, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

Ark. Code Ann. § 16-111-104 (1987) (emphasis added). While this section recognizes a party's right to a declaratory judgment, a justiciable controversy is required. *Mastin v. Mastin*, 316 Ark. 327, 871 S.W.2d 585 (1994). Regarding declaratory relief in general, this court has said that "declaratory relief will lie where (1) there is a justiciable controversy; (2) it exists between parties with adverse interests; (3) those seeking relief have a legal interest in the controversy; and (4) the issues involved are ripe for decision." *Donovan v. Priest*, 326 Ark. 353, 359, 931 S.W.2d 119, 122 (1996), *cert. denied*, 519 U.S. 1149 (1997) (citing *U.S. Term Limits, Inc. v. Hill*, 316 Ark. 251, 872 S.W.2d 349 (1994)). We have further stated: "The courts do not construe acts similar to said Act 274 [of 1953, known as the Declaratory Judgment Act,] to require actual litigation as a prerequisite to asking for a declaratory judgment, but they do state, as a general rule, that litigation must be pending or threatened." *Jessup v. Carmichael*, 224 Ark. 230, 232, 272 S.W.2d 438, 440 (1954). In *Jessup*, the plaintiff requested a declaratory judgment allowing her to make such use of her lot so as to prevent the defendant's surface water from flowing across it. *Id*. We held that the trial court did not abuse its discretion in refusing to grant a declaratory judgment where there was no guarantee that litigation would follow such use of her lot. *Id*. We reiterated that whether relief under the Act should be granted is a matter resting in sound, judicial discretion and specified that such relief ought not ordinarily be granted where another adequate remedy is at

hand. *Id.* (citing *Adams v. Atlantic City*, 26 N.J. Misc. 259, 59 A.2d 825 (1948)).

Appellant counters that appellees can show no real, non-speculative, impending threat of prosecution and, as such, their claims are not justiciable. They cite the court to *Poe v. Ullman*, 367 U.S. 497 (1961), wherein the United States Supreme Court dismissed a declaratory-judgment action seeking to invalidate certain Connecticut statutes prohibiting the use of contraceptives. The appellants' complaint alleged that the prosecutor intended to prosecute any offense against Connecticut law and that the prosecutor claimed the use of and advice concerning contraceptives would constitute offenses. *Id.* The law prohibiting the use of contraceptives had been on the state's books since 1879 with only one recorded prosecution under the statute, despite the fact that contraceptives were commonly and notoriously sold in Connecticut drug stores. *Id.* In determining that the record disclosed no justiciable controversy because it failed to show that the challenged statutes would be enforced against the appellants, the Court stated:

> The various doctrines of "standing," "ripeness," and "mootness," which this Court has evolved with particular, though not exclusive, reference to such cases are but several manifestations — each having its own "varied application" — of the primary conception that *federal judicial power* is to be exercised to strike down legislation, whether state or federal, only at the instance of one who is himself immediately harmed, or immediately threatened with harm, by the challenged action. "This court can have no right to pronounce an abstract opinion upon the constitutionality of a State law. Such law must be brought into actual or threatened operation upon rights properly falling under judicial cognizance, or a remedy is not to be had here." "The party who invokes the power (to annul legislation on grounds of its unconstitutionality) must be able to show not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement. . . ." [Citations omitted.]
>
> . . . .
>
> *It is clear that the mere existence of a state penal statute would constitute insufficient grounds to support a federal court's adjudication of its constitutionality in proceedings brought against the State's prosecuting officials*

> *if real threat of enforcement is wanting.* If the prosecutor expressly agrees not to prosecute, a suit against him for declaratory and injunctive relief is not such an adversary case as will be reviewed here. Eighty years of Connecticut history demonstrate a similar, albeit tacit agreement. The fact that Connecticut has not chosen to press the enforcement of this statute deprives these controversies of the immediacy which is an indispensable condition of constitutional adjudication. [Citations omitted.]

*Id.* at 503-04, 507-08 (emphasis added). The Court's analysis in *Poe* was specifically limited to the federal judicial power to declare a state law unconstitutional. It is important to note that the statute at issue in *Poe* was struck down just four years later in *Griswold v. Connecticut*, 381 U.S. 479 (1965), after the State of Connecticut prosecuted two people for violating it.

More recently, in *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979), the United States Supreme Court held a challenge to the criminal penalty provision of Arizona's farm labor statute to be justiciable despite the state's claim that the provision had not been and might never be applied. The Court held that the plaintiffs were not without some reason in fearing prosecution given that the statute could apply to conduct in which they intended to engage and the fact that the state had not disavowed any intention of invoking the provision. *Id.* The Court stated:

> A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. But "[o]ne does not have to await the consummation of threatened injury to obtain preventative relief. If the injury is certainly impending, that is enough. [Citations omitted.]
>
> . . . .
>
> When a plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Doe v. Bolton*, 410 U.S. 179, 188, 93 S. Ct. 739, 745, 35 L. Ed. 2d 201 (1973). But "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Younger v. Harris*, 401 U.S.

37, 42, 91 S. Ct. 746, 749,. 27 L. Ed. 2d 669 (1971); *Golden v. Zwickler*, 394 U.S. 103, 89 S. Ct. 956, 22 L. Ed. 2d 113 (1969).

*Id.* at 298. Also, in 1977, the Court found injunctive and declaratory remedies to be appropriate prior to the enforcement of certain food and drug regulations where the plaintiffs demonstrated that the impact of the regulations on them was sufficiently direct and immediate.* *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), *overruled on other grounds*, 430 U.S. 99 (1977). The Fifth Circuit Court of Appeals has said the fact that a statute has not been enforced and that there is no certainty it will be enforced does not establish a lack of case or controversy where the state has not disavowed enforcement. *See KVUE, Inc. v. Austin Broadcasting Corp.*, 709 F.2d 922 (5th Cir. 1983).

Both *Poe* and *Babbitt* involved the question of whether the plaintiffs had established a case or controversy within the meaning of Article III of the U.S. Constitution, as opposed to abstract questions not justiciable by a federal court. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. at 297. Thus, neither case is binding on this court's determination of whether a justiciable controversy exists in the case now before us. In analyzing these cases, we must recognize that *Poe* held only that the federal judicial power would not allow the Court to produce an abstract opinion on the constitutionality of a state law unless the law was brought into actual or threatened operation. The Court also indicated that eighty years of nonenforcement under a state statute deprived it of the immediacy necessary to invoke the Court's power of constitutional adjudication. *Babbitt* appears to show a relaxing of the standard set forth in *Poe* by finding questions of a statute's constitutionality to be justiciable while conceding that the statute had not been and might never be enforced. *Babbitt* also lessens the federal standard by requiring only impending injury and by acknowledging that plaintiffs are not without fear of prosecution where a state refuses to disavow any intention of utilizing a statute.

Statements by this court on the existence of a justiciable controversy can be found in *Donovan v. Priest*, *supra*, and *Cummings v. City of Fayetteville*, 294 Ark. 151, 741 S.W.2d 638 (1987). The *Donovan* case involved a taxpayer who brought an action to enjoin the Secretary of State from placing a proposed amendment to the

Arkansas Constitution on the ballot for general election. *Donovan v. Priest*, 326 Ark. 353, 931 S.W.2d 119. Respondent and intervenors in that case argued that the taxpayer's challenge was a question of substantive constitutional law not yet ripe for our review. *Id.* We decided the case and held that the proposed constitutional amendment violated state and federal constitutional provisions. We distinguished between substantive and procedural challenges to the validity of proposed constitutional amendments, concluding that substantive constitutional challenges "necessarily involve fact-specific issues and thus are not ripe for review until the proposed measure becomes law and a case in controversy arises." *Id.* at 360, 931 S.W.2d at 122. We noted in *Donovan* that this court has previously addressed constitutional challenges to the validity of a proposal, limiting such review to situations where the proposed measure was clearly contrary to law. *Id.* at 359, 931 S.W.2d at 121 (citing *Plugge v. McCuen*, 310 Ark. 654, 841 S.W.2d 139 (1992)). Later, in *Kurrus v. Priest*, 342 Ark. 434, 29 S.W.3d 669 (2000), we again held that a proposed constitutional amendment violated state and federal constitutional provisions, acknowledging that ninety-year-old precedent existed to support the consideration of the constitutional validity of a proposed amendment prior to an election. *See Stilly v. Henson*, 342 Ark. 346, 28 S.W.3d 274 (2000); *Czech v. Baer*, 283 Ark. 457, 677 S.W.2d 833 (1984); *Hodges v. Dawdy*, 104 Ark. 583, 149 S.W. 656 (1912).

In the case of *Cummings v. City of Fayetteville, supra*, a Fayetteville lawyer brought a declaratory-judgment action against the city, seeking a declaration that a statute governing the recall of city directors was unconstitutional. This court held that there was no justiciable case or controversy absent any allegation that attempts had been made to obtain voters' signatures as required by the recall statute or any specific allegation that the petitioner wished to recall a city director. We said:

> The Declaratory Judgment Statute is applicable only where there is a present actual controversy, and all interested persons are made parties, and only where justiciable issues are presented. It does not undertake to decide the legal effect of laws upon a state of facts which is future, contingent or uncertain. A declaratory judgment will not be granted unless the danger or dilemma of the plaintiff

is present, not contingent on the happening of hypothetical future events: the prejudice to his position must be actual and genuine and not merely possible, speculative, contingent, or remote.

*Cummings v. City of Fayetteville*, 294 Ark. at 154-55, 741 S.W.2d at 639-40 (quoting Anderson, *Anderson on Declaratory Judgments* § 187 (2d ed. 1951)). We concluded in *Cummings* that, while the appellant had demonstrated he had an argument with the legislature, it was not one that yet amounted to a controversy that this court should decide. *Id.*

Here, none of the appellees have been prosecuted under Ark. Code Ann. § 5-14-122; nor have they alleged a specific prosecutorial threat made under the statute. However, distinguishable from the situation in *Cummings*, the appellees in this case do claim that they presently engage in conduct prohibited by the statute. The facts regarding the prohibited conduct are not future or uncertain, but, by appellees' own admissions, are present and ongoing. These appellees face a daily dilemma due to the existence of the statute.

▮ Though this court clearly requires the existence of a justiciable controversy prior to granting a declaratory judgment, we have heard challenges to the constitutionality of statutes and regulations by persons who did not allege that they had been penalized under the statutes or regulations. We have not always required prosecution or a specific threat of prosecution as a prerequisite for challenging a statute. In *Epperson v. Arkansas*, 393 U.S. 97 (1968), and *State v. Epperson*, 242 Ark. 922, 416 S.W.2d 322 (1967), *rev'd*, 393 U.S. 97 (1968), both this court and the United States Supreme Court considered a challenge to an Arkansas criminal statute that violated constitutional rights but had not triggered an actual prosecution during its forty-year history.[1] Likewise, in

---

[1] In *Epperson*, a high school biology teacher challenged the constitutionality of an Arkansas law adopted in 1928 that made it illegal for a teacher in any state-supported school or university to teach Darwin's theory of evolution. *Epperson v Arkansas*, 393 U.S. 97 (1968). For the academic year 1965-1966, the school administration adopted and prescribed a biology textbook that contained a chapter setting forth the theory of evolution. *Id.* at 102. *See Doe v. Bolton*, 410 U.S. 179 (1973) (physicians presented justiciable controversy despite fact that record did not disclose any of them had been prosecuted or

*Magruder v. Arkansas Game and Fish Commission,* 287 Ark. 343, 698 S.W.2d 299 (1985), we heard a challenge to a regulation by a plaintiff who claimed no specific threat under the regulation. There, a fisherman challenged an AGFC regulation prohibiting the taking of black bass under fifteen inches from an Arkansas lake. The fisherman did not allege that he was either penalized for the conduct or threatened with enforcement of the regulation. This court allowed the fisherman to challenge the regulation, holding:

> The appellant alleged he was a licensed fisherman who frequently fished Lake Maumelle. Nothing in the record showed the commission challenged that allegation. If the commission's regulation is to be enforced it will have an effect on persons who fish Lake Maumelle regardless of who owns the lake. One whose rights are thus affected by a statute has standing to challenge it on constitutional grounds. *Thompson v. Arkansas Social Services,* 282 Ark. 369, 669 S.W.2d 878 (1984); *Sweeney v. Sweeney,* 267 Ark. 595, 593 S.W.2d 21 (1980). The same rule applies to official acts other than statutes, *Rogers v. Paul,* 328 U.S. 198, 86 S. Ct. 358, 15 L. Ed. 2d 265 (1965), and thus it applies to the regulation in question here.

*Id.* at 344, 698 S.W.2d at 300.

In *Bennett v. National Assoc. for the Advancement of Colored People,* 236 Ark. 750, 370 S.W.2d 79 (1963), this court held that a justiciable controversy was presented when the NAACP filed suit seeking a declaratory judgment to the effect that four Acts of the legislature were unconstitutional. There was no allegation that anyone had been prosecuted or specifically threatened with prosecution under the Acts. We said:

> [W]e are convinced that the Supreme Court of the United States would hold that the Act was aimed at the NAACP and required a compulsory disclosure of information which was proscribed by the decision of the Supreme Court of the United States in *Bates v. City of Little Rock, supra.* The whole tenor of the decision in the case of *NAACP v. Button* leads us to the inevitable conclusion that this Act No. 13 would be promptly declared

---

threatened with prosecution for violation of the state's abortion statutes, citing *Epperson v. Arkansas, supra*).

> unconstitutional in line with *Bates v. City of Little Rock, supra,* and *NAACP v. Button, supra.*

*Id.* at 757–58, 370 S.W.2d at 84. Ultimately, we declared all four of the Acts to be unconstitutional.

Similarly, at least one federal circuit court of appeals has held that a stated present intent to voluntarily cease enforcement, evidenced by the affidavits of local law enforcement officials insisting that they will not enforce the challenged law, will not deprive the court of jurisdiction to hear the challenger's claims. *United Food And Commercial Workers Int'l Union v. IBP, Inc.,* 857 F.2d 422 (8th Cir. 1988) (citing 6A Moore's Federal Practice, paragraph 57.18[2] at 57–189 (2d ed. 1987) and *Seattle School District No. 1 v. Washington,* 633 F.2d 1338, 1342 n. 1 (9th Cir. 1980), *aff'd,* 458 U.S. 457 (1982), for the proposition that "[w]here the enforcement of a regulatory statute would cause plaintiff to sustain a direct injury, the action may properly be maintained, whether or not the public officer has 'threatened' suit; the presence of the statute is threat enough, at least where the challenged statute is not moribund").

Other state courts have recently found declaratory-judgment challenges to same-sex sodomy prohibitions to be justiciable even where there was no proof that the laws had been enforced against consenting adults in private or that prosecutors had made literal threats of prosecution. In *Gryczan v. State,* 283 Mont. 433, 942 P.2d 112 (1997), homosexual respondents sought a declaratory judgment on the constitutionality of Montana's deviate-sexual-conduct statute, which criminalized consensual sex between adults of the same gender. Though the respondents alleged only that they were injured by the mere existence of the statute, the Supreme Court of Montana held that the case presented a justiciable controversy. *Id.* In *Campbell v. Sundquist,* 926 S.W.2d 250 (Tenn. Ct. App. 1996), homosexual plaintiffs brought a declaratory judgment action seeking a declaration that Tennessee's Homosexual Practices Act violated the Tennessee Constitution. The Court of Appeals of Tennessee held that the plaintiffs had standing and were entitled to maintain an action even though none of them had been prosecuted under the statute. *Id.*

Nonetheless, appellant in the case now before us contends that, because Arkansas's sodomy statute has never been enforced against consenting adults, appellees have shown no threat of prosecution under the statute. Appellees have admitted to presently engaging in conduct that is violative of Ark. Code Ann. § 5-14-122. Thus, according to the statute, appellees are presently engaging in criminal conduct. Appellant suggests that appellees are not harmed by the statute because it has not been enforced for private, consensual conduct in over fifty years. However, Arkansas's present sodomy statute was enacted in 1977, just twenty-five years ago. In the past decade, three different attempts to repeal the statute have failed, sending a signal to prosecutors of the statute's continuing vitality.[2] The State has refused to disavow enforcement of the statute and is, in fact, vigorously defending the legality of the statute in the present action. In addition, albeit for public or nonconsensual conduct, there have been prosecutions under Arkansas's sodomy statute as recently as 1988. *See, e.g., Young v. State,* 296 Ark. 394, 757 S.W.2d 544 (1988)(conviction for nonconsensual sodomy under Ark. Code Ann. § 5-14-122); *United States v. Lemons,* 697 F.2d 832 (8th Cir. 1983) (conviction under Ark. Code Ann. § 5-14-122 for consensual conduct in a public restroom). In addition, our sodomy statute has been used outside the criminal context in ways harmful to those who engage in same-sex conduct prohibited by the statute. *See, e.g., Stowe v. Bowlin,* 259 Ark. 221, 531 S.W.2d 955 (1976) (holding that court should have allowed appellant to impeach appellee's credibility as a witness by referencing appellee's admitted engagement in sodomy); *Thigpen v. Carpenter,* 21 Ark. App. 194, 730 S.W.2d 510 (1987) (affirming chancellor's consideration of appellant's homosexuality as a relevant factor in depriving her of the custody of her children).

Clearly this statute is not moribund, and the State has not foresworn enforcement of it. Appellees are precisely the indi-

---

[2] The appellees' petition for declaratory judgment states that a bill to repeal the challenged portion of the statute was sponsored in 1991 by former Senator Vic Snyder but received a "do not pass" recommendation by the Arkansas General Assembly's Judiciary Committee, and the "bill died on calendar." Similar bills "died in the Judiciary Committee" in 1993 and 1995.

viduals against whom section § 5-14-122 is intended to operate. As they admit to presently engaging in behavior that violates the statute and intending to engage in future behavior that violates the law, and as the State has not disavowed any intention of invoking the criminal-penalty provisions of Ark. Code Ann. § 5-14-122, we cannot say that appellees are without some reason to fear prosecution for violation of the sodomy statute. *See Magruder v. Arkansas Game and Fish Commission*, 287 Ark. 343, 698 S.W.2d 299 (1985); *Bennett v. National Assoc. for the Advancement of Colored People*, 236 Ark. 750, 370 S.W.2d 79 (1963); *Babbitt v. United Farm Workers Nat'l Union*, 422 U.S. 289 (1979); and *Epperson v. Arkansas*, 393 U.S. 97 (1968). To hold otherwise would leave appellees trapped in a veritable Catch-22. As long as Arkansas prosecutors exercise their discretion and fail to prosecute those individuals who violate the sodomy statute through consensual, private behavior, appellees and those similarly affected by the statute would have no choice but to suffer the brand of criminal impressed upon them by a potentially unconstitutional law. The discretionary acts of the State's prosecutors could effectively bar shut the courthouse doors and protect the sodomy statute from constitutional challenge. We cannot allow this to happen.

## II. Right to Privacy

For his second point on appeal, appellant argues that there is nothing in Arkansas history or case law to support the circuit court's conclusion that Article 2, Section 2, of the Arkansas Constitution confers a constitutionally protected right to privacy encompassing consensual, private, homosexual sodomy. He asserts that, while Article 2's Declaration of Rights arguably recognizes certain zones of privacy, nothing in the text of the provisions either implicitly or explicitly gives rise to a separate, independent right of privacy encompassing homosexual sodomy. Furthermore, appellant claims that no Arkansas case has ever recognized a right to privacy and that the circuit court's finding of such a right is based upon an impermissible interpretation of the Arkansas Constitution. Appellees respond that Arkansas's Constitution can be held to provide greater privacy rights than the United States Constitution. They focus on the fact that Article 2,

Section 2, of the Arkansas Constitution protects not only rights made explicit therein, but also "inherent and inalienable" rights and urge that, while the Declaration of Rights does not expressly mention a right to privacy, Article 2, Section 2, contains guarantees of individual liberty and happiness.

■ ■ In considering the constitutionality of a statute, this court recognizes the existence of a strong presumption that every statute is constitutional. *Barclay v. First Paris Holding Co.*, 344 Ark. 711, 42 S.W.3d 496 (2001). The burden of rebutting a statute's constitutionality is on the party challenging the legislation. *Id.* An act should be struck down only when there is a clear incompatibility between the act and the constitution. *Id.* We acknowledge that it is the duty of the courts to sustain a statute unless it appears to be clearly outside the scope of reasonable and legitimate regulation. *City of Little Rock v. Smith*, 204 Ark. 692, 163 S.W.2d 705 (1942).

■ ■ As an initial matter, appellant contends that a facial challenge cannot be maintained because a plaintiff may only challenge a law as facially invalid if he shows that application of the law will restrict his First Amendment rights. We disagree. Both *United States v. Salerno*, 481 U.S. 739 (1987), and *Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239 (1998), make it clear that it is the "overbreadth" doctrine alone that is not recognized outside the context of the First Amendment. With regard to facial challenges in general, this court has said facial invalidation of a statute is appropriate if it can be shown "that under *no* circumstances can the statute be constitutionally applied." *Linder v. Linder*, 348 Ark. 322, 349, 72 S.W.3d 841, 856 (2002) (citing *Salerno*, 481 U.S. at 745). Here, appellant is correct that appellees have not shown Ark. Code Ann. § 5-14-122 to be facially invalid. There is no allegation that the statute's prohibition of conduct involving animals is unconstitutional. Absent a showing that the sodomy statute can never be constitutionally applied, we cannot find the statute facially unconstitutional.

■ Appellees also mount an "as applied" challenge to the constitutionality of Ark. Code Ann. § 5-14-122 and urge this court to affirm the trial court's ruling that the statute violates their

right to privacy as guaranteed by the Arkansas Constitution. The Arkansas Constitution, like the U.S. Constitution, does not contain an explicit guarantee of the right to privacy. The development of the federal right to privacy is instructive. In his dissent in *Olmstead v. United States*, 277 U.S. 438, 478 (1928), *overruled in part by Katz v. Ohio*, 389 U.S. 347 (1967), Mr. Justice Brandeis characterized "the right to be let alone" as "the right most valued by civilized men." The Supreme Court has since recognized a penumbra of rights emanating from the First Amendment and protecting privacy from governmental intrusion. *See, e.g., Griswold v. Connecticut*, 381 U.S. 479 (1965) (finding a fundamental right to marital privacy). The Court has also held that there is a right to privacy founded in both the Fourteenth Amendment's concept of personal liberty and in the penumbras of the Bill of Rights. *See Roe v. Wade*, 410 U.S. 113 (1973). However, in *Bowers v. Hardwick*, 478 U.S. 186 (1986), the Court held that the U.S. Constitution provides no fundamental right to engage in homosexual sodomy, noting that the conduct has historically been condemned.[3] In *Bowers*, the Court reversed the Eleventh Circuit Court of Appeals, which had concluded that Georgia's sodomy statute violated the respondent's fundamental rights because his homosexual activity was a private and intimate association beyond the reach of state regulation. *Id.*

Though it is clear that no fundamental right to engage in homosexual sodomy is protected by the United States Constitution, the textual and structural differences between the Bill of Rights and our own Declaration of Rights mandate that we explore whether such a right exists under the Arkansas Constitu-

---

[3] The respondent in *Bowers* had been charged with violating the Georgia sodomy statute by committing sodomy with another adult male in the bedroom of his home. After a preliminary hearing, the prosecutor decided not to present the matter to the grand jury. 478 U.S. 186. The respondent then brought suit in the federal court challenging the constitutionality of the statute insofar as it criminalized sodomy performed in private and between consenting adults. *Id. See* Ga. Code Ann. § 16-6-2(a) (1984) ("[a] person commits the offense of sodomy when he performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another"). The sex or status of the persons who engage in the sexual act is irrelevant under the Georgia statute. 478 U.S. at 200 (Powell, J., concurring).

tion. Many states[4] have identified a right to privacy implicit in

[4] According to *Bowers v. Hardwick*, all fifty states outlawed sodomy prior to 1961. 478 U.S. 186. At the time of *Bowers*, twenty-five states and the District of Columbia criminalized private, consensual sodomy by adults. *Id.* Today, twenty-six states and the District of Columbia have legislatively repealed their sodomy laws: Alaska - 1978 Alaska Sess.Laws 219; Act of May 12, 1975, ch. 71, §§ 4-12; Arizona - 2001 Ariz. Sess. Laws, House Bill 2016, effective May 9, 2001; California - 1975 Cal. Stat. 131, 133-136; Colorado - Colorado Criminal Code, chs. 40-3-403, 40-3-404, 1971 Colo. Sess. Laws 388, 423; Connecticut - Conn. Penal Code, Pub. Act No. 828, §§ 66-91, 1969 Conn. Pub. Acts 1554, 1579-85; Delaware - Delaware Criminal Code, ch. 497 §§ 766, 767, 58 Del. Laws 1611, 1665-66 (1972); District of Columbia - 1993 D.C. Crim. Code, *see* Right to Privacy Amendment Act, Bill 10-30; Hawaii - Hawaii Penal Code, Act 9, §§ 733-735, 1972 Hawaii Sess. Laws 32, 90-01; Act of Feb. 25, 1976, Pub. Law No. 148, ch. 4 §§ 2; Illinois - 1961 Ill. Laws 1983, Act of July 28, 1971; Indiana - 1976 Ind. Acts 718, 733-734; Iowa - Iowa Criminal Code, ch. 1245, §§ 901-906, 1976 Iowa Acts 549, 558-559; Maine - Maine Criminal Code, ch. 499, §§ 251-255, 1975 Me. Laws 1273, 1297-1300; Nebraska - Nebraska Criminal Code, L.B. 38 §§ 32-38, 1977 Neb. Laws 88, 100-102; Act of July 2, 1973, ch. 532:26; Nevada - 1993 Laws of Nev. chapter 236, Act of June 16, 1993; New Hampshire - 1973 N.H. Laws 999, 1011; New Jersey - 1978, N.J. Laws 482, 547-550, ch 95; New Mexico - 1975 N.M. Laws chapter 109, Act of April 3, 1975; North Dakota - 1973 N.D. Laws ch. 117, Act of March 28, 1973; Ohio - 1972 Ohio Laws 1966, 1906-1911; Oregon - Oregon Criminal Code of 1971, §§ 104-120, 1971 Or. Laws 1873, 1907-1910; Crimes Code, No. 334, ch. 31; Rhode Island - 1998 R.I. Pub. Laws ch 24, Act of June 5, 1998; South Dakota - S.D. Sess. Laws 227, 260-261; Vermont - 1977 Vt. Acts & Resolves 51, Act of April 23, 1977; Washington - Washington Criminal Code, ch. 260, §§ 9A.88.100, 1975 Wash. Laws 817, 858; West Virginia - 1976 W.Va. Acts 241; Act of Feb. 24, 1977, ch. 70; Wyoming - 1977 Wyo. Sess. Laws 228, 228-310.

Nine states have invalidated sodomy laws by judicial decision: Georgia in *Powell v. State*, 510 S.E.2d 18 (1998); Kentucky in *Commonwealth v. Wasson*, 842 S.W.2d 487 (Ky. 1992); Maryland in *Williams v. State*, 1998 Extra LEXIS 260, Baltimore City Circuit Court, (January 14, 1999) (trial court holding that sodomy statute did not apply to consensual, noncommercial, private sexual behavior. The decision was not appealed by the State); Massachusetts in *Gay and Lesbian Advocates & Defenders v. Attorney General*, 436 Mass. 132, 763 N.E.2d 38 (2002); Minnesota in *Doe, et al. v. Ventura, et al.*, 2001 WL 543734, No. 01-489 (Dist. Ct. Hennepin County May 15, 2001) (neither the State of Minnesota nor Attorney General Mike Hatch appealed the lower court decision); Montana in *Gryczan v. Montana*, 942 P.2d 112 (1997); New York in *People v. Onofre*, 415 N.E.2d 936 (N.Y. 1980), *cert. denied*, 451 U.S. 987 (1981); Pennsylvania in *Commonwealth v. Bonadio*, 415 A.2d 47 (Pa. 1980) (the state legislature later repealed the law in 1995); *Tennessee in Campbell v. Sundquist*, 926 S.W.2d 250 (Tenn. Ct. App. 1996).

Six states, including Arkansas, maintain "same-sex" sodomy statutes: Arkansas, Ark. Code Ann. § 5-14-122 (Repl. 1997); Kansas, Kan. Stat. Ann. § 21-3505 (1995); Michigan, Mich. Comp. Laws Ann. 750.158, .338(a)-(b) (1991); Missouri, Mo Rev. Stat. § 566.090 (1999); Oklahoma, Okla. Stat tit. 21 § 886 (1983); Texas, Tex. Penal Code Ann. §§ 21.06 (1989).

their own constitutions that is more protective than the federal right. For example, the Supreme Court of Georgia, which recognizes a "liberty of privacy" guaranteed by a state constitutional provision declaring that no person shall be deprived of liberty except by due process of law, recently held that a sex-neutral statute criminalizing intimate consensual sexual acts performed by adults in private impermissibly infringed upon the right to privacy. *Powell v. State*, 270 Ga. 327, 510 S.E.2d 18 (1998). Similarly, the Supreme Court of Montana recently held that the explicit right to privacy in Montana's Declaration of Rights protects private, same-gender, consensual, noncommercial sexual conduct. *Gryczan v. State*, 283 Mont. 433, 942 P.2d 112 (1997). The Tennessee Court of Appeals found that Tennessee's Homosexual Practices Act constituted an unwarranted governmental intrusion into the plaintiff's right to privacy. *Campbell v. Sundquist*, 926 S.W.2d 250 (Tenn. Ct. App. 1996).

The Supreme Court of Kentucky has also held that Kentucky's criminal statute proscribing consensual homosexual sodomy violated the privacy guarantees of the Kentucky Constitution. *Commonwealth v. Wasson*, 842 S.W.2d 487 (Ky. 1992). As with our state constitution, no language specifying a "right of privacy" appears in the Kentucky Constitution. *Id.* However, like Arkansas's, Kentucky's Bill of Rights speaks of all men as "free and equal" with certain "inherent and inalienable rights," including the pursuit of liberty and happiness. *Id.* Based upon its constitutional language and the state's tradition of recognizing and protecting individual rights, the Kentucky Supreme Court held that the state's sodomy law violated a state right to privacy, saying: "[I]t is *not within the competency of government to invade the privacy of a citizen's life and to regulate his conduct in matters in which he alone is concerned*, or to prohibit him any liberty the exercise of which will

---

Nine states and Puerto Rico maintain statutes prohibiting same-sex and opposite-sex sodomy: Alabama – Ala. Code 1975, §§ 13A-6-63 — 65); Florida – Fla. Code. § 800.02 (1993); Idaho – Idaho Code § 18-6605 (Supp. 201); Louisiana – La. Rev. Stat. Ann. § 14:89 (1986); Mississippi – Miss. Code Ann. § 97-29-59 (1972); North Carolina – N.C. Gen. Stat. S 14-177 (1994); Puerto Rico – Penal Code sections 99 and 103 (33 L.P.R.A. §§ 4061 and 4065); South Carolina – S.C. Code Ann. § 16-15-120 ( 1985); Utah – Utah Code Ann. § 76-5-403 (1995); Virginia – Va. Code Ann. § 18.2-361 (1994).

not directly injure society." *Id.* at 494–95 (quoting *Commonwealth v. Campbell*, 133 Ky. 50, 117 S.W. 383, 386 (1909)) (emphasis in original).

 This court must now explore the rights granted to the citizens of Arkansas. No right to privacy is specifically enumerated in the Arkansas Constitution.[5] However, Article 2, Section 29, provides that the rights enumerated in our constitution must not be construed in such a way as to deny or disparage other rights retained by the people:

> This enumeration of rights shall not be construed to deny or disparage others retained by the people and to guard against any encroachments on the rights herein retained, or any transgression of any of the higher powers herein delegated, we declare that everything in this article is excepted out of the general powers of the government, and shall forever remain inviolate; and that all laws contrary thereto, or to the other provisions herein contained, shall be void.

Ark. Const. art. 2, § 29. Therefore, we begin by looking to the language of other constitutional provisions in order to determine whether a right to privacy is inherent in our constitutional guarantees under the Arkansas Constitution.

 Article 2, Section 2, guarantees our citizens certain inherent and inalienable rights, including the enjoyment of life and liberty and the pursuit of happiness:

> All men are created equally free and independent, and have certain inherent and inalienable rights, amongst which are those of enjoying and defending life and liberty; of acquiring, possessing, and protecting property and reputation, and of pursuing their own happiness. To secure these rights governments are instituted among men, deriving their just powers from the consent of the governed.

Ark. Const. art. 2, § 2. Sections 8 and 21 of Article 2 also ensure that no Arkansan will be deprived of life, liberty, or property

---

[5] The right to privacy is specifically mentioned in Amendment 51, Section 6, assuring a voter's "right to privacy in deciding whether to register or in applying to register to vote . . . ." Ark. Const. amend. 51, § 6.

without due process of law. Ark. Const. art. 2, §§ 8 and 21. This court has previously found the words "life, liberty and property" to be broad enough to protect the right of a prostitute to walk or ride on the streets with a male person over the age of 14 years. *Coker v. City of Ft. Smith*, 162 Ark. 567, 258 S.W. 388 (1924).

Our constitution also recognizes the right of persons to be secure in the privacy of their own homes:

> The right of the people of this State to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue except upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or thing to be seized.

Ark. Const. art. 2, § 15. This court has recognized a constitutional right of individuals to be free from unreasonable intrusions into their homes. *See, e.g., Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582 (2002) (finding an illegal search in violation of Ark. Const. art. 2, § 15).

The rights granted by our constitution are guaranteed to all citizens equally. Article 2, Section 3, provides: "The equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity, nor exempted from any burden or duty, on account of race, color or previous condition." Ark. Const. art. 2, § 3. "The General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens." Ark. Const. art. 2, § 18.

In addition to the rights granted by our constitution, we must examine the development of a right to privacy in the statutes, rules, and case law of this state. Privacy is mentioned in more than eighty statutes enacted by the Arkansas General Assembly.[6] This frequent reference to the right to privacy indi-

---

[6] Some of the statutes referencing privacy are as follows: Ark. Code Ann. § 4-99-401, et seq. (Repl. 2001) (the "Arkansas Consumer Telephone Privacy Act"); Ark. Code Ann. § 5-71-213(a)(8) (Repl. 1997) (loitering illegal if "invading the privacy of another");

cates a public policy of the General Assembly supporting a right to privacy.

■ A right to privacy is also recognized in the Arkansas Rules of Criminal Procedure. The commentary to Ark. R. Crim. P. 2.2 notes:

> The approach of a citizen pursuant to a policeman's investigative law enforcement function must be reasonable under the existent circumstances and requires a weighing of the government's interest for the intrusion against the individual's right to privacy and personal freedom; to be considered are the manner and intensity of the interference, the gravity of the crime involved, and the

---

Ark. Code Ann. § 5-71-225(a)(2) (Repl. 1997) (regulations for long-term care to protect the privacy of the elderly); Ark. Code Ann. § 6-18-1204(3) (Repl. 1997) (Arkansas Student Publications Act prohibiting "[p]ublications that constitute an unwarranted invasion of privacy[.]"); Ark. Code Ann. § 7-5-310 (Repl. 2000) (privacy when voting); Ark. Code Ann. § 9-14-208(j) (2002) (Office of Child Support Enforcement exempting records subject to privacy safeguards from a business records classification); Ark. Code Ann. § 9-14-210(g) – (l) (2002) (setting out Office of Child Support Enforcement privacy safeguards); Ark. Code Ann. § 9-27-309(h) (Repl. 2002) (protecting the privacy of juvenile records); Ark. Code Ann. § 12-12-205(2)(A) (Supp. 2001) (protecting the individual missing person's right to privacy); Ark. Code Ann. § 12-12-213 (Repl. 1999) (prohibiting invasion of privacy by the Arkansas Crime Information Center); Ark. Code Ann. § 12-51-301(e)(2) (Supp. 2001) (prohibiting the Interstate Commission for Adult Offender Supervision from disclosing any information or official records to the extent they would adversely affect personal privacy rights); Ark. Code Ann. § 14-14-110(b) (Repl. 1998) (prohibiting the release of personal, medical, or other records where the right to individual privacy exceeds the merits of public disclosure); Ark. Code Ann. § 16-43-1001(g) (Repl. 1999) (permitting a protective order for videotapes of closed-circuit testimony which are part of the court record for the purpose of protecting the privacy of the alleged victim); Ark. Code Ann. § 16-44-203(d) (Repl. 1999) (protecting the privacy of the alleged victim where videotapes are a part of the court record); Ark. Code Ann. § 20-7-302 (Repl. 2000) (requiring the Department of Health database to be maintained to protect confidentiality and privacy); Ark. Code Ann. § 20-10-1003(b)(13) (Repl. 2000) (mandating that the Office of Long-Term Care develop a "residents' bill of rights" protecting the residents' right to privacy); Ark. Code Ann. § 23-42-207(3) (Repl. 2000) (Records of the Securities Commissioner are all public, except those whose disclosure of which would constitute a clearly unwarranted invasion of personal privacy); Ark. Code Ann. § 23-48-808 (Repl. 2000) (requiring that customer-bank communication terminals have reasonable safeguards designed to protect the privacy and confidentiality of account information); Ark. Code Ann. § 25-19-105(b)(12) (Repl. 2002) (certain records exempted from release under Freedom of Information Act where their "disclosure would constitute a clearly unwarranted invasion of personal privacy").

circumstances attending the encounter. *Baxter v. State*, 274 Ark. 539, 626 S.W.2d 935, *cert. denied*, 457 U.S. 1118, 102 S. Ct. 2930, 73 L. Ed. 2d 1331 (1982); *Blakemore v. State*, 25 Ark. App. 335, 758 S.W.2d 425 (1988).

Comment to Ark. R. Crim. P. 2.2 (2002). *See also State v. McFadden*, 327 Ark. 16, 938 S.W.2d 797 (1997). Likewise, the commentary to Ark. R. Crim. P. 12.1 provides that "[s]earches of the person shall be carried out with all reasonable regard for privacy . . . ."

In addition, this court has said that "Rule 8.1 is designed and has as its purpose to afford an arrestee protection against an unfounded invasion of liberty and privacy . . . basic and fundamental rights which our state and federal constitutions secure to every arrestee." *Bolden v. State*, 262 Ark. 718, 724, 561 S.W.2d 281, 284 (1978). *See also Richardson v. State*, 283 Ark. 82, 671 S.W.2d 164 (1984). We have also noted a right to privacy in connection with Rule 10.1:

> Ark. R. Crim. P. 10.1 (2001) defines a search as follows: "[A]ny intrusion other than an arrest, by an officer under color of authority, upon an individual's person, property, or privacy, for the purpose of seizing individuals or things or obtaining information by inspection or surveillance, if such intrusion, in the absence of legal authority or sufficient consent, would be a civil wrong, criminal offense, or violation of the individual's rights under the Constitution of the United States or this state." (Emphasis added.) The commentary to Rule 10.1 notes that "[t]he key word in the definition is 'intrusion,' a term sufficiently broad to encompass any legally cognizable interference with an individual's right to privacy. . . . [T]he definition of 'search' is extended to cover any intrusions upon the privacy of an individual. [Emphasis omitted.]

*Holmes v. State*, 347 Ark. 530, 536-37, 65 S.W.3d 860, 863 (2002). Finally, we have declared privacy to be a critical factor in Ark. R. Crim. P. 16.2:

> We say in [Rule 16.2] that before evidence is suppressed because of a violation of constitutional rights, a determination must be made as to: the importance of the particular interest violated; the

extent of deviation from lawful conduct; the extent to which the violation was willful; the extent to which privacy was invaded.

*Moore v. State*, 261 Ark. 274, 278-F, 551 S.W.2d 185, 190 (1977).

We have recognized protection of individual rights greater than the federal floor in a number of cases. In the criminal context, we have said: "The privacy of the citizens in their homes, secure from nighttime intrusions, is a right of vast importance as attested not only by our Rules but also by our state and federal constitutions." *Fouse v. State*, 337 Ark. 13, 23, 989 S.W.2d 146, 150-51 (1999); *Garner v. State*, 307 Ark. 353, 358-59, 820 S.W.2d 446, 449-50 (1991). The right-to-privacy concept has even been mentioned in connection with an earlier challenge to the predecessor statute to section 5-14-122. In *Carter v. State*, 255 Ark. 225, 500 S.W.2d 368 (1973), we held that enforcement of our prior sodomy statute did not violate the defendants' right to privacy where the act of which they were accused occurred in an automobile at a well-lighted public rest area adjacent to an interstate highway.

In the area of civil law, this court has been in the forefront in recognizing the existence of four actionable forms of the tort of invasion of privacy: (1) appropriation; (2) intrusion; (3) public disclosure of private facts; and (4) false light in the public eye. *See Wal-Mart Stores, Inc. v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002); *Dunlap v. McCarty*, 284 Ark. 5, 678 S.W.2d 361 (1984); *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 840 (1979); *Olan Mills v. Dodd*, 234 Ark. 495, 353 S.W.2d 22 (1962). *See also* Comment, *The Right of Privacy*, 6 Ark. L. Rev. 459 (1952). Likewise, we have discussed an individual's privacy interests in the context of Ark. Code Ann. § 25-19-105(b)(12) (Repl. 2002), noting that it exempts disclosure of personnel records only when an unwarranted invasion of personal privacy would result. *Young v. Rice*, 308 Ark. 593, 826 S.W.2d 252 (1992). In *Young*, the court concluded section 25-19-105(b)(12) requires that the public's right to knowledge be weighed against an individual's right to privacy. *Id.*

In considering our constitution together with the statutes, rules, and case law mentioned above, it is clear to this

court that Arkansas has a rich and compelling tradition of protecting individual privacy and that a fundamental right to privacy is implicit in the Arkansas Constitution. Moreover, it is important to point out that we have recognized due process as a living principle. Justice Frankfurter's opinion in *Wolf v. Colorado*, 338 U.S. 25 (1949), has been quoted with approval by this court:

> It is of the very nature of a free society to advance in its standards of what is deemed reasonable and right. Representing as it does a living principle, due process is not confined within a permanent catalogue of what may at a given time be deemed the limits or the essentials of fundamental rights.

*Carroll v. Johnson*, 263 Ark. 280, 288, 565 S.W.2d 10, 15 (1978). In accordance with the language in *Carroll*, we hold that the fundamental right to privacy implicit in our law protects all private, consensual, noncommercial acts of sexual intimacy between adults. Because Ark. Code Ann. § 5-14-122 burdens certain sexual conduct between members of the same sex, we find that it infringes upon the fundamental right to privacy guaranteed to the citizens of Arkansas.

As the right to privacy is a fundamental right, we must analyze the constitutionality of Ark. Code Ann. § 5-14-122 under strict-scrutiny review. *Linder v. Linder*, 348 Ark. 322, 72 S.W.3d 841 (2002). When a statute infringes upon a fundamental right, it cannot survive unless "a compelling state interest is advanced by the statute and the statute is the least restrictive method available to carry out [the] state interest." *Thompson v. Arkansas Social Services*, 282 Ark. 369, 374, 669 S.W.2d 878, 880 (1984). According to the circuit court's order in this case, appellant concedes that the State can offer no compelling state interest sufficient to justify the sodomy statute. Therefore, Arkansas's sodomy statute at Ark. Code Ann. § 5-14-122 is unconstitutional as applied to private, consensual, noncommercial, same-sex sodomy.

### III. Equal Protection

The circuit court ruled that Ark. Code Ann. § 5-14-122 impermissibly criminalizes conduct solely on the basis of the sex of the participants in violation of Arkansas's Equal Rights Amend-

ment. Ark. Const art. 2, § 18. On appeal, appellant contends that the statute does not violate the Equal Rights Amendment because the statute does not make an impermissible gender classification or require unequal treatment between genders. According to appellant, the statutory classification that appellees promote is based on sexual orientation rather than on sex. Appellees, on the other hand, contend that the trial court was correct in finding the sodomy statute creates a gender classification.

The guarantee of equal protection serves to "[protect] minorities from discriminatory treatment at the hands of the majority. Its purpose is not to protect traditional values and practices, but to *call into question* such values and practices when they operate to burden disadvantaged minorities. . . ." *Commonwealth v. Wasson*, 842 S.W.2d at 499 (quoting *Watkins v. U.S. Army*, 875 F.2d 699 (9th Cir. 1989) (Norris, J. concurring)). Arkansas's Equal Rights Amendment specifically states: "The General Assembly shall not grant to any citizen or class of citizens privileges or immunities which upon the same terms shall not equally belong to all citizens." Ark. Const. art. 2, § 18. A statute violates the federal Equal Protection Clause on the basis of sex where it provides dissimilar treatment for men and women who are similarly situated. *Reed v. Reed*, 404 U.S. 71 (1971). For classifications based upon gender, an intermediate level of scrutiny is in order. *Wengler v. Druggist Mutual Ins. Co.*, 446 U.S. 142 (1980); *Orr v. Orr*, 440 U.S. 268 (1979). To withstand an intermediate level of scrutiny, classifications by gender must serve important governmental objectives and be substantially related to achievement of those objectives. *Conser v. Biddy*, 274 Ark. 367, 625 S.W.2d 457 (1981); *Hatcher v. Hatcher*, 265 Ark. 681, 580 S.W.2d 475 (1979). Appellant in this case attempts to justify the statute at issue only in accordance with a rational-basis standard of review. He has not shown that the statute could withstand intermediate scrutiny. In any event, as will be discussed below, we need not delve into an intermediate analysis as appellant has not offered sufficient evidence to show that Ark. Code Ann. § 5-14-122 can withstand a rational-basis review.

According to the argument advanced by appellant, the State of Arkansas has a legitimate interest in criminalizing homosexual

sodomy through its broad police power. He contends that the prohibitions of the statute are justified by the State's legitimate interest in protecting public morality. Appellees counter that long-standing, negative views about a group of people do not amount to proper justification for differential treatment. Citing *Loving v. Virginia*, 388 U.S. 1 (1967), they assert that illegitimate disapproval, biases, and stereotypes, no matter how firmly ingrained, must fall to constitutional requirements once an equal protection challenge is mounted. The U.S. Supreme Court in *Loving* struck down Virginia's anti-miscegenation statute, concluding that, although the prohibition on interracial marriages precluded either race from marrying a member of the other race, the anti-miscegenation statute rested "solely upon distinctions drawn according to race." *Id.* at 11.

 Though homosexual citizens do not constitute a protected class, they are a separate and identifiable class for purposes of equal-protection analysis. Under well-settled equal-protection analysis, any legislation that distinguishes between two groups of people must be rationally related to a legitimate governmental purpose. *Romer v. Evans*, 517 U.S. 620 (1996); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985). In *Ester v. Nat'l Home Centers*, we set out our rational-basis test as follows:

> The party challenging a statute's constitutionality has the burden of proving that the act lacks a rational relationship to a legitimate objective of the legislature under any reasonably conceivable set of facts. *Arkansas Hosp. Ass'n v. Arkansas St. Bd. Of Pharmacy*, 297 Ark. 454, 763 S.W.2d 73 (1989); *Streight v. Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983). *See also Smith v. Denton*, 320 Ark. 253, 895 S.W.2d 550 (1995); *Winters v. State*, 301 Ark. 127, 782 S.W.2d 566 (1990). It is not our role to discover the actual basis for the legislation. *Arkansas Hosp. Ass'n, supra*; *Streight v. Ragland*, 280 Ark. 206, 655 S.W.2d 459 (1983). We merely consider whether there is any rational basis which demonstrates the possibility of a deliberate nexus with state objectives so that the legislation *is not the product of arbitrary and capricious government purposes*. If we determine that any rational basis exists, the statute will withstand constitutional challenge. *See Arkansas Hosp. Ass'n., supra*.

335 Ark 356, 364-65, 981 S.W.2d 91, 96 (1998)(emphasis added).

■ ■ This court has said that the police power is very broad and comprehensive and embraces maintenance of good order, quiet of the community, and the preservation of public morals. *Carter v. State*, 255 Ark. 225, 500 S.W.2d 368 (1973). We further stated in *Carter* that, "the legislature may, *within constitutional limitations*, prohibit all things hurtful to the comfort, safety, and welfare of the people. . . ." *Id.* at 231, 500 S.W.2d at 372 (emphasis added). However, this court has also embraced language from the United States Supreme Court announcing the classic statement of the rule on police power and limiting the police power to that which is not unduly oppressive:

> To justify the State in . . . interposing its authority in behalf of the public, it must appear—first, that the interests of the public . . . require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals.

*Hand v. H&R Block, Inc.*, 258 Ark. 774, 781, 528 S.W.2d 916, 920 (1975) (quoting *Lawton v. Steele*, 152 U.S. 133 (1894)). In the same case, we noted that "the police power can only be exercised to suppress, restrain, or regulate the liberty of individual action, when such action is injurious to the public welfare." *Id.* at 782, 528 S.W.2d at 921 (quoting *State v. Hurlock*, 185 Ark. 807, 49 S.W.2d 611 (1932)). "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Romer v. Evans*, 517 U.S. at 634 (quoting *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973))(emphasis in original). Government cannot avoid the strictures of equal protection simply by deferring to the wishes or objections of some fraction of the body politic. *City of Cleburne v. Cleburne Living Center*, 473 U.S. at 448.

The statute at issue in this case restrains the liberty of those who wish to engage in private, consensual acts of same-sex sodomy. There is no prohibition against members of opposite sexes engaging in the same conduct. As stated by the Supreme Court of Kentucky:

> Certainly, the practice of deviate sexual intercourse violates traditional morality. But so does the same act between heterosexuals, which activity is decriminalized. . . . The issue here is not whether sexual activity traditionally viewed as immoral can be punished by society, but whether it can be punished solely on the basis of sexual preference.

*Commonwealth v. Wasson*, 842 S.W.2d at 499. Appellant offers no reason why this conduct is injurious to the public welfare when engaged in by members of the same sex but completely protected when engaged in by members of opposite sexes. Several of our sister states, when striking down analogous sodomy statutes, have looked to the American Law Institute's Model Penal Code and Commentaries, which state in relevant part:

> The usual justification for laws against such conduct is that, even though it does not injure any identifiable victim, it contributes to moral deterioration of society. One need not endorse wholesale repeal of all "victimless" crimes in order to recognize that legislating penal sanctions solely to maintain widely held concepts of morality and aesthetics is a costly enterprise. It sacrifices personal liberty, not because the actor's conduct results in harm to another citizen but only because it is inconsistent with the majoritarian notion of acceptable behavior.

ALI, Model Penal Code, Part II, 1980 Ed., pp. 362-63.

In discussing the argument that advancement of the morals of Tennessee citizens provided justification for that state's Homosexual Practices Act, the Court of Appeals of Tennessee noted: "We recognize that many of the laws of this State reflect 'moral choices' regarding the standard of conduct by which the citizens of this State must conduct themselves. However, we also recognize that when these 'moral choices' are transformed into law, they have constitutional limits." *Campbell v. Sundquist*, 926 S.W.2d at 264. In similar form, Kentucky concluded that there was no rational basis for criminalizing sexual activity solely on the basis of majoritarian sexual preference. *Commonwealth v. Wasson, supra.* Kentucky relied upon *Commonwealth v. Bonadio*, 490 Pa. 91, 415 A.2d 47 (1980), for guidance. In *Bonadio*, the Supreme Court of Pennsylvania said:

With respect to regulation of morals, the police power should properly be exercised to protect each individual's right to be free from interference in defining and pursuing his own morality but not to enforce a majority morality on persons whose conduct does not harm others. "No harm to the secular interests of the community is involved in atypical sex practice in private between consenting adult partners." [Citations omitted.]

490 Pa. 91, 96, 415 A.2d 47, 50 (1980).

▆▆▆ We agree that the police power may not be used to enforce a majority morality on persons whose conduct does not harm others. The Arkansas Equal Rights Amendment serves to protect minorities at the hands of majorities. As noted in *Bonadio*, the State has a clear and proper role to protect the public from offensive displays of sexual behavior, to protect people from forcible sexual contact, and to protect minors from sexual abuse by adults. *Commonwealth v. Bonadio, supra.* However, criminal statutes, including those proscribing indecent exposure, rape, statutory rape, and the like, are in existence to protect the public from precisely such harms.

▆▆▆ In conclusion, appellant has not offered sufficient reasoning to show that notions of a public morality justify the prohibition of consensual, private intimate behavior between persons of the same sex in the name of the public interest. There is no contention that same-sex sodomy implicates the public health or welfare, the efficient administration of government, the economy, the citizenry, or the promotion of the family unit. We have consistently held that legislation must bear a real or substantial relationship to the protection of public health, safety and welfare, in order that personal rights and property rights not be subjected to arbitrary or oppressive, rather than reasonable, invasion. *See Union Carbide Carbon Corp. v. White River District*, 224 Ark. 558, 275 S.W.2d 455 (1955). *See also Ports Petroleum Co. v. Tucker*, 323 Ark. 680, 916 S.W.2d 749 (1996). We echo Kentucky in concluding that "we can attribute no legislative purpose to this statute except to single out homosexuals for different treatment for indulging their sexual preference by engaging in the same activity heterosexuals are now at liberty to perform." *Commonwealth v. Wasson*, 848 S.W.2d at 501.

The General Assembly cannot act, under the cloak of police power or public morality, arbitrarily to invade personal liberties of the individual citizen. *Ports Petroleum Co. v. Tucker, supra.* Section 5-14-122 does invade such liberties, arbitrarily condemning conduct between same-sex actors while permitting the exact same conduct among opposite-sex actors. Appellant has failed to demonstrate how such a distinction serves a legitimate public interest. Absent some rational basis for this disparate treatment under the law, we must now hold that Ark. Code Ann. § 5-14-122 is unconstitutional as violative of Arkansas's Equal Rights Amendment.

Affirmed.

BROWN and HANNAH, JJ., concur.

THORNTON, J., and ARNOLD, C.J., dissent.

ROBERT L. BROWN, Justice, concurring. I concur with the majority opinion but would only strike down the sodomy statute primarily because it applies to the noncommercial sexual conduct of consenting gay or lesbian adult couples in their homes. The State would have it that government agencies should be permitted to intrude into the bedrooms of the homes of consenting gay and lesbian adults to police whether they are engaged in noncommercial sex. This is so even while the bedrooms of married and unmarried heterosexual couples would not be subjected to such government interference and scrutiny, because they are not covered by the Arkansas sodomy statute. The State's position is totally at odds with the bedrock principles of independence, freedom, happiness, and security which form the core of our individual rights under the Arkansas Constitution:

> All men are created equally free and independent, and have certain inherent and inalienable rights, amongst which are those of enjoying and defending life and liberty; of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness. To secure these rights governments are instituted among men, deriving their just powers from the consent of the governed.

Ark. Const. Art. 2, § 2.

If anything has been sacrosanct over the past hundred and fifty years under the common law of Arkansas, it is the principle that a person's home is his castle. *See, e.g., McGuire v. Cook*, 13 Ark. 448, 458 (1853) ("[T]he house of every man is to him as his castle and fortress, as well for his defense against injury and violence as for repose."). That principle continues undiluted and undiminished even to the present day. *See, e.g., Griffin v. State*, 347 Ark. 788, 67 S.W.3d 582 (2002). If such is true of the home, how much more so of the bedroom?

The majority opinion speaks eloquently on why these plaintiffs have standing to bring this action and why this matter is justiciable. I agree completely that the State has placed the plaintiffs in a catch-22 situation. According to the State, they are dubbed criminals but have no recourse in the courts to correct this status. The State's counsel at oral argument contended that the sodomy statute is a "dead letter" and that no prosecutor currently enforces it. Nor has it been enforced for decades, counsel adds. In the same breath, she urges that the statute must be kept on the books and that the plaintiffs should be prevented from challenging it, even while the statute makes them criminals. It is indisputable that the sodomy statute hangs like a sword of Damocles over the heads of the plaintiffs, ready to fall at any moment.

The idea of keeping a criminal statute on the books which no one wants to enforce is perverse in itself. This brands the plaintiffs with a scarlet letter that the State contends they should have no chance to contest in the courts of this State. The State's position comes perilously close to complete inconsistency and smacks of a no-lose proposition for the government and a no-win situation for the plaintiffs. Other sister states have refused to countenance this argument and have permitted attacks on their sodomy statutes by plaintiffs who admit to the conduct but who have not been arrested. *See, e.g., Gryczan v. State*, 283 Mont. 433, 942 P.2d 112 (1997); *Campbell v. Sundquist*, 926 S.W.2d 250 (Tenn. Ct. App. 1996).

Arkansas is reportedly one of four remaining states that criminalizes gay and lesbian sexual conduct between consenting adult couples in the bedroom of a home. The other three are

Texas, Kansas, and Oklahoma. Georgia recently reversed itself two years after upholding its sodomy statute and struck it down as a violation of the right to privacy, as incorporated in the due process clause of the Georgia Constitution. *Powell v. State*, 270 Ga. 327, 510 S.E.2d 18 (1998), *rever'g Christensen v. State*, 266 Ga. 474, 468 S.E.2d 188 (1996). The Georgia reversal is symptomatic of the national sea change in attitude towards statutes such as these. The trend, even in Arkansas, has been for the legislature to chip away at the sodomy statute. In 1975, the General Assembly repealed the sodomy statute applicable to homosexuals and heterosexuals, which made the crime a felony punishable by up to twenty-one years in prison. *See* Act 928 of 1975. In 1977, the statute found its way back into the Criminal Code but this time as a misdemeanor punishable by up to a year in jail and applicable only to sexual conduct by those of the same sex. Act 828 of 1977, now codified at Ark. Code Ann. § 5-14-122 (Repl. 1997).

This court has upheld enforcement of the predecessor sodomy statute against prohibited acts committed in a parked automobile by two men. *See Carter v. State*, 255 Ark. 225, 500 S.W.2d 368 (1973), *cert. denied*, 416 U.S. 905 (1974); *Connor v. State*, 253 Ark. 854, 490 S.W.2d 114 (1973). In both instances, this court made the point that the acts prosecuted did not fall within a zone of privacy but were public acts, leaving open the question of liability for intimate sexual acts in the privacy of one's home. The issue now before this court is whether to permit enforcement of the statute for conduct that by everyone's admission takes place in private, that is, in the sanctuary of the bedroom. That is an altogether different scenario from what took place in *Carter* and *Connor*. We, of course, have statutes in the Criminal Code prohibiting public indecency such as occurred in the *Carter* and *Connor* cases. *See* Ark. Code Ann. § 5-14-111 (Repl. 1997).

I agree with the majority that the right to privacy is a fundamental right under the Arkansas Constitution and that it is violated by enforcement of the sodomy statute against consenting adults engaged in noncommercial sexual activity in the bedroom of their homes. I further agree that enforcement of the act against one group of citizens violates the equal protection clause of the Arkansas Constitution (Article 2, section 3) and that the State has

no valid reason for doing so. The State posits that it is enforcing Arkansas morals as part of its police power. But pronouncing moral judgments for bedroom behavior that criminalizes the conduct of this class of citizens exceeds the bounds of legislative authority and amounts to little more than a government morality fixed by a majority of the General Assembly. That flies in the face of the basic constitutional rights of independence, freedom, happiness, and security. Other states have noted how far afield the General Assembly roams when it intrudes into bedrooms of this class of consenting adults. *See, e.g., Powell v. State, supra; Gryczan v. State, supra; Campbell v. Sundquist, supra; Commonwealth v. Wasson*, 842 S.W.2d 487 (Ky. 1993). I agree, and would only add that the bedroom for these adults is one area where people need a good "leaving alone" by their government and police agencies.

Societal mores change. Thirty years ago I daresay most religious denominations would have supported the existence of the sodomy statute or something akin to it. Today, five religious denominations have filed an *amicus* brief in this case challenging the statute's constitutionality. The unmistakable trend, both nationally and in Arkansas, is to curb government intrusions at the threshold of one's door and most definitely at the threshold of one's bedroom. I concur in this trend, and for that reason, I join the majority opinion to the extent it holds that the sodomy statute is unconstitutional as applied to consenting adult couples engaged in noncommercial sexual conduct in the privacy of their homes.

With respect to *public* sexual conduct prohibited under the sodomy statute, the General Assembly has a legitimate interest in criminalizing public acts of sexual indecency and has done so for *all persons* under the Public Sexual Indecency Act, codified at Ark. Code Ann. § 5-14-111 (Repl. 1997). In short, under § 5-14-111, there is not different treatment of homosexuals and heterosexuals. Because the legitimate government interest is satisfied by § 5-14-111, there is no reason to retain § 5-14-122 on the books. For that reason, I concur with the majority opinion.

HANNAH, J., joins.

RAY THORNTON, Justice, dissenting. In my view, the majority has issued an advisory opinion declaring

unconstitutional a law passed by the legislature and signed into law by the governor. I respectfully dissent on the grounds that there was no justiciable case before us for decision, and because I believe we should heed the principles articulated by Justice Felix Frankfurter, writing for the United States Supreme Court, in *Poe v. Ullman*, 367 U.S. 497 (1961). Justice Frankfurter cautioned courts that they should use their powers to overturn legislative acts only when a case is properly before the court, when he wrote:

> Whenever, in pursuance of an honest and actual antagonistic assertion of rights by one individual against another, there is presented a question involving the validity of any act of any legislature, State or Federal, and the decision necessarily rests on the competency of the legislature to so enact, the court must, in the exercise of its solemn duties, determine whether the act be constitutional or not; but such an exercise of power is the ultimate and supreme function of courts. It is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act.

*Id.* (*quoting Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339 (1892)).

When this court previously reviewed the constitutionality of the statute that preceded Ark. Code Ann. § 5-14-122, we recognized the role of the legislative branch in adoption and changing of laws. *See Carter & Burkhead v. State*, 255 Ark. 225, 500 S.W.2d 368 (1973). In *Carter*, which held Arkansas's previous sodomy statute constitutional, the court expressed a recognition that the responsibility of changing unsuitable statutory provisions is delegated to the legislative branch. We explained:

> If social changes have rendered our sodomy statutes unsuitable to the society in which we now live, we need not be concerned about the matter because there is a branch of our government within whose purview the making of appropriate adjustment and changes peculiarly lies.

*Id.*

It is no small matter that our constitution separates the responsibility of governance into three branches: the legislative branch, the executive branch, and the judicial branch. I believe we should respect that separation of powers, and declare a legislative act unconstitutional only when, in Justice Frankfurter's words, the exercise of such powers "is legitimate only in the last resort, and as a necessity in the determination of real, earnest, and vital controversy between individuals." *Poe, supra.* Because I think that appellees have failed to present a justiciable case or controversy, and because I think that deciding the constitutionality of a statute in a case that fails to comply with our standing requirements violates principles of separation of powers, I must respectfully dissent.

While there are differing views among members of the court on the question whether the case before us presents a justiciable issue, all of us agree that our earlier decision in *Bryant v. Picado*, 338 Ark. 227, 996 S.W.2d 17 (1999), did not establish justiciability as part of the law of the case, and that the trial court's finding on this issue was an incorrect interpretation of our opinion. For that reason, I want to specifically outline my analysis of the issue of justiciability and my conclusion that no justiciable case or controversy was presented in the case before us.

Appellees' complaint was brought pursuant to Ark. Code Ann. § 16-111-104 (1987). The statute provides:

> Any person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

*Id.*

We have noted that actual litigation is not required for relief under our declaratory-judgment statute. *Jessup v. Carmichael*, 224 Ark. 230, 272 S.W.2d 438 (1954). However, the statue does require that litigation be pending or threatened. *Id.* We have also noted that while Ark. Code Ann. § 16-111-104 recognizes a party's right to a declaratory judgment, a justiciable controversy is

required. *Mastin v. Mastin*, 316 Ark. 327, 871 S.W.2d 585 (1994) (holding that the case presented no justiciable controversy and that a review of the matter would render an improper advisory opinion). The justiciability requirement was discussed in *Andres v. First Ark. Development Finance Corp.*, 230 Ark. 594, 324 S.W.2d 97 (1959). In that case, we explained:

> Our declaratory judgment act was not intended to allow any question to be presented by any person: the matters must be justiciable.
>
> \* \* \*
>
> Since the purpose of the declaratory relief is to liquidate uncertainties and interpretations which might result in future litigation it may be maintained when these purposes may be subserved. The requisite precedent facts or conditions, which the courts generally hold must exist in order that declaratory relief may be obtained, may be summarized as follows: (1) There must exist a justiciable controversy; that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it; (2) the controversy must be between persons whose interests are adverse; (3) the party seeking declaratory relief must have a legal interest in the controversy; in other words, a legally protectable interest; and (4) the issue involved in the controversy must be ripe for judicial determination.
>
> \* \* \*
>
> The Declaratory Judgment Statute is applicable only where there is a present actual controversy, and all interested persons are made parties, and only where justiciable issues are presented. It does not undertake to decide the legal effect of laws upon a state of facts which is future, contingent or uncertain. A declaratory judgment will not be granted unless the danger or dilemma of the plaintiff is present, not contingent on the happening of hypothetical future events; the prejudice to his position must be actual and genuine and not merely possible, speculative, contingent, or remote.

*Id.* (*quoting Anderson on Declaratory Judgments* (2d. ed. 1951)); *see also Cummings v. City of Fayetteville*, 294 Ark. 151, 741 S.W.2d 638 (1987) (holding that there was no justiciable controversy and that while many laws may be easily subject to challenge we may only review such matters in a proper law suit).

In the case brought to us for decision, I cannot find that appellees have suffered any actual threat of prosecution for violating Ark. Code Ann. § 5-14-122 (Repl. 1997). In fact, none of the members of the class that appellant represents have prosecuted or have threatened to prosecute any of the appellees for violation of Ark. Code Ann. § 5-14-122. Moreover, appellant notes that there has been no prosecution under this statute or its predecessor challenging adult consensual sex occurring in a private setting for at least fifty years. This lack of prosecution for a prolonged period of time establishes a record of nonenforcement of the statute. Here, appellees have not been prosecuted for violation of a statute that they *admittedly* violate. Appellees have failed to establish that they suffer the threat of actual prosecution for violation of Ark. Code Ann. § 5-14-122. The only fear of prosecution appellees assert is hypothetical and contingent upon the happening of future events.

The facts of this case are indistinguishable from those considered by the Nevada Supreme Court in *Doe v. Bryan*, 102 Nev. 523, 728 P.2d 443 (1986). The Nevada Court determined that a group of homosexuals had failed to establish standing to challenge a statute prohibiting sodomy. In *Doe*, four adult homosexuals brought a declaratory judgment action seeking to challenge Nevada's "infamous sexual offenses" statute. *Id*. The appellants had not been arrested or prosecuted under the statute. The appellee argued that because the appellants had not been arrested or prosecuted for violation of the statute, they lacked standing to challenge the statute. *Id*. The court explained:

> Nevada has a long history of requiring an actual justiciable controversy as a predicate to judicial relief. Moreover, litigated matters must present an existing controversy, not merely the prospect of a future problem.

*Id*. In affirming the trial court's granting of a motion to dismiss, the Nevada Court held:

> Appellants here allege that they have never been arrested for violating NRS 201.190 and the record does not reflect any enforcement efforts by the State against appellants or others.
> There is no indication that appellants are facing an immediate threat of arrest for violation of NRS 201.190 or that the risk

of prosecution is, to any degree, more than imaginary or speculative. Therefore, this court affirms the dismissal of appellants' complaint by the district court because appellants lacked standing to seek declaratory relief.

*Id.*

*Doe* is indistinguishable from the case now before us. We can look to our sister state for guidance in determining that the appellees' claims in this case are nonjusticiable.

However, the fact that appellees have not been prosecuted or suffered an actual threat of arrest is not the end of our justiciability analysis. Appellees may also establish a justiciable controversy if they can establish that they have suffered actual harm caused by the statute. To determine whether appellees have established that they suffered actual harms based upon Ark. Code Ann. § 5-14-122, it is useful to look to the pleadings. In their complaint, appellees alleged: (1) that they have a genuine, specific, and concrete fear of prosecution under the statute; (2) that they fear that they will lose parental rights based on violation of this statute; (3) that they fear that they will lose their housing based on violation of the statute; and (4) that they fear that they will lose their jobs based on violation of the statute.

In the affidavits which were filed in support of their motion for summary judgment, appellees alleged: (1) that they are harmed because the statute condemns homosexual sex without condemning heterosexual sex; (2) that they suffer a stigmatic harm because they know that by violating the statute they are engaging in criminal behavior; (3) that they suffer a heightened risk of additional discrimination if the statute is not declared unconstitutional because the statute is used as justification for other forms of discrimination; (4) that they fear prosecution because police officers are free to arrest appellees for violating the statute; (5) that they fear prosecution because in Texas the sodomy law is enforced; (6) that they fear arrest because some police officers are hostile towards gay people; and (7) that they fear prosecution because neither appellant nor the other members of his class have repudiated enforcement of the statute.

A review of appellees' allegations demonstrates that appellees have failed to establish a justiciable controversy. While appellees

allege harms which they *may* suffer, there is no allegation that these harms have occurred and no connection has been established between the possibility of the alleged harms and the existence of Ark. Code Ann. § 5-14-122. First, appellees are concerned about a possible loss of housing. There is no allegation that the appellee fearing a loss of her lease has lost her lease. Second, appellees state a fear of loss of professional licenses, but cite no instances where this has occurred. Additionally, there is no showing that the appellee who contends that he failed to get a promotion because the statute is on the books actually suffered the harm of loss of employment. Third, appellees fear the loss of parental rights, and possible adverse actions taken by discriminatory police officers. While these feared consequences are dire, they have yet to occur. I would further note that appellees' allegations of harms focus primarily on a societal bias against their sexual preferences, but fail to establish that such bias results from the existence of Ark. Code Ann. § 5-14-122. Because appellees have failed to establish that there is an actual threat of prosecution or that they have suffered actual harm resulting from the existence of the statute, I would conclude that they have not presented a justiciable controversy.

Because appellees have failed to establish a justiciable controversy, any opinion delivered by this court can only be advisory. It has been well settled that this court does not render advisory opinions nor answer academic questions. *See, Saunders v. Neuse*, 320 Ark. 547, 898 S.W.2d 43 (1995); *Walker v. McCuen*, 318 Ark. 508, 886 S.W.2d 577 (1994); *Dougan v. Gray*, 318 Ark. 6, 884 S.W.2d 239 (1994); *Gladden v. Bucy*, 299 Ark. 523, 772 S.W.2d 612 (1989); and *Neeley v. Barber*, 288 Ark. 384, 706 S.W.2d 358 (1986).

By embarking upon a path of writing advisory opinions declaring statues unconstitutional in a response to a petition for declaratory judgment without requiring that a justiciable controversy be presented, we step away from our responsibilities in the judicial branch and act as a superlegislative body with an assumed authority to correct mistakes that the court from time to time may believe have been made by our General Assembly.

I am authorized to state that Chief Justice ARNOLD joins in this dissent.