Rhonda K. Wood, Justice, dissenting. This case presents a five, justiciable controversy, and I would reach the merits of the hospitals’ appeal. One purpose of a declaratory-judgment action is for a party to seek a declaration of its rights before waiting |sto be sued. These actions eliminate legal uncertainty and promote efficiency. But under the majority’s view, the hospitals must wait to be sued before they can know their rights under the Peer Review Fairness Act. This result subverts the purpose of the declaratory-judgment action,' something that for all practical purposes the hospitals cannot, enjoy. I respectfully dissent. The Peer Review Fairness Act imposes a number of duties on hospitals regarding the physician-credentialing process. The duties attach once a “professional review activity” begins. A professional review activity includes “investigations,” which are defined as “a process conducted by a professional review body to obtain facts related to a concern or complaint about a physician in order to determine whether a professional review action should be requested or recommended.” Ark.Code Ann. § 20-9-1303(4), ' (7) (Repl. 2014). Any time a “professional review activity” or “investigation” begins, a hospital must give notice to the doctor, include the doctor’s attorney in the fact-finding process, provide exculpatory information, and allow the doctor to lobby the peer review body. Ark.Code Ann. § 20-9-1304. Should the hospitals fail to comply with their duties, a doctor could sue for an injunction and attorney’s fees. Ark,Code Ann. § 20-9-1307(a), (b). Thus, the hospitals’ obligations arise ;ih the ordinary course of business: anytime someone complains about a doctor — and the hospital seeks to find facts — a whole host of obligations arises. The hospitals need to know what the law requires them to do or whether the law, or portions of it, is unconstitutional. For this reason, this action is tailor-made for a declaratory judgment. |3One type of declaratory-judgment action allows “a person threatened with .liability or uncertain of his or her rights and . obligations [to] seek[ ] a judicial determination of the issue rather than waiting to be sued.” David Newbern et al., Arkansas Civil Practice and Procedure § 36:1 (5th ed. 2010). A declaratory judgment is especially appropriate .in dispútes between private citizens and public officials about the meaning of the constitution or of statutes. McDonald v. Bowen, 250 Ark. 1049, 1051, 468 S.W.2d 765, 767 (1971). In this way, some citizens have brought suit against the- State and have requested that the court declare ' certain laws unconstitutional. See, e.g., McGhee v. Ark State Bd. of Collection Agencies, 375 Ark. 52, 289 S.W.3d 18 (2008) (Check-Cashers Act); Jegley v. Picado, 349 Ark. 600, 80 S.W.3d 332 (2002) (anti-sodomy statute). Jegley is a central case on standing to bring a ' declaratory judgment. There, plaintiffs 'brought á declaratory-judgment action against the State, through the prosecuting attorney, and requested that the court declare the anti-sodomy statute unconstitutional. Jegley, 349 Ark. at 608, 80 S.W.3d at 334. In response, the State argued that no justiciable controversy existed because the plaintiffs had not been threatened with prosecution under the statute, which in any event had lain dormant for fifty years. Id. at 611-12, 80 S.W.3d at 336-37, We found that a justici- ■ able controversy existed, however, because plaintiffs “intend[ed] to engage in future behavior that violates the law and ...- the State has -not disavowed any intention of invoking the criminal-penalty provisions of [the law].” Id. at 622, 80 S.W.3d at 343. Like the plaintiffs in Jegley, the hospitals are presently engaged in conduct regulated by statute. Without question, complaints are filed routinely against doctors — in response, | inthe hospital conducts fact-finding. Such an event likely triggers the hospitals’ duties under the Act. And unlike Jegley, where the justiciability question was close due to the statute’s dormancy, this Act and its federal counterpart are often invoked; indeed, an entire regulatory apparatus exists on both the state and federal level- regarding the issue of peer review. - See' generally Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101-11152. It’s neither theoretical nor hypothetical that peer-review activity does and will continue to take place. One study estimates that around 1000 peer-review actions were reported to a national database annually between 2002 and 2005. See Eleanor D. Kinney, Hospital Peer Review of Physicians: . Does Statutory Immunity Increase Risk of Unwarranted Professional Injury?, 13 Mich. St. U.J. Med. & L. 57, 79 (2009). Plainly, before a “peer review action” or negative credentialing recommendation takes place, there must be a “peer review activity” or investigation. So if there are 10Ó0 “peer review actions” per year, then it’s safe to assume that there are many more “peer review activities.” This observation leads to another point: the majority claims that the hospitals provided no evidence that .a present controversy exists. But a central claim of the hospitals’ complaint was that they don’t know exactly what event triggers their duties under the statute. Presumably, under the Act, the hospitals’ duties attach once an investigation begins. But the hospitals assert that the statute’s definition of investigation is so broad, and covers such ordinary and routine procedures,[3] that the definition is unconstitutionally vague. In In other words, a. controversy exists about when a controversy arises. The hospitals sufficiently pled this in their' complaint, and they had no obligation to present' additional evidence to establish a justiciable controversy on this question of law. ■ Finally, the fact that the hospitals sued the State rather than an individual physician should not prevent this lawsuit"from going forward for lack of an adverse party. The adverse-party requirement ensures that both sides of an argument are presented to the court. See, e.g., Mastin v. Mastin, 816 Ark. 327, 330, 871 S.W.2d 5.85, 587 (1994) (finding no justiciable controversy “in a one-brief case where the matter has not been fully argued or even contested”); UHS of Ark., Inc. v. Gity of Sherwood, 296 Ark, 97, 101, 752 S.W.2d 36, 38 (1988) (finding no justiciable controversy when the State, in its answer, admitted that the plaintiff was entitled to relief); see also Baker v. Carr, 369 U.S..186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (explaining that “the gist of the question of standing” is whether-a plaintiff has “alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon whicli the court so largely depends for illumination of difficult constitutional questions”). The State, via the attorney general, has robustly defended this Act both below and on appeal. We have the benefit of two well-briefed, adverse arguments as well as amicus curiae briefs. We should - answer the squarely presented questions. . "All hospitals have quality-assurance policies in place.' Under such policies, hospital personnel review files and records following a complaint or medical accident, éven if no wrongdoing has occurred on the part of a physician.... As codified, the Act can be read to treat such -quality-assurance procedures and informal talks as 'investigations,’ thus triggering specific notification and disclosure requirements.” Brief for Arkansas Hospital Association as Amicus Curiae 8. ■