Cite as 2021 Ark. 55

# SUPREME COURT OF ARKANSAS

No. CV-20-562

|  |  |
|---|---|
| | **Opinion Delivered:** March 11, 2021 |
| JOHN THURSTON, IN HIS OFFICIAL CAPACITY AS ARKANSAS SECRETARY OF STATE; AND LESLIE RUTLEDGE, IN HER OFFICIAL CAPACITY AS ARKANSAS ATTORNEY GENERAL<br><br>APPELLANTS | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT [NO. 60CV-20-4956] |
| V. | HONORABLE MARY SPENCER MCGOWAN, JUDGE |
| SAFE SURGERY ARKANSAS, A BALLOT QUESTION COMMITTEE; AND DR. LAURIE BARBER, INDIVIDUALLY AND ON BEHALF OF SAFE SURGERY ARKANSAS<br><br>APPELLEES | AFFIRMED. |

**KAREN R. BAKER, Associate Justice**

Appellants John Thurston, in his official capacity as Arkansas Secretary of State; and

Leslie Rutledge, in her official capacity as Arkansas Attorney General (collectively "Thurston"),

appeal the Pulaski County Circuit Court's order granting Appellees', Safe Surgery Arkansas, a

ballot question committee; and Dr. Laurie Barber (collectively "SSA's"), request for preliminary

injunction. The order also found the entirety of Arkansas Code Annotated section 7-9-601(b)

(Repl. 2018) unconstitutional and enjoined Thurston from applying its provisions. Thurston

presents two arguments on appeal: (1) the circuit court lacked jurisdiction to consider SSA's

request for a preliminary injunction because SSA did not present a justiciable controversy; and

(2) even if a justiciable controversy was present, the circuit court erred in granting the preliminary injunction. We affirm.

*Facts and Procedural History*

The parties agree that this case is informed by two original actions before this court in 2020, *Arkansans for Healthy Eyes v. Thurston*, 2020 Ark. 270, 606 S.W.3d 582, and *Miller v. Thurston*, 2020 Ark. 267, 605 S.W.3d 255.

In *Healthy Eyes*, the petitioners (AHE), an opposing ballot question committee, filed a complaint against Thurston challenging the sufficiency of a statewide-initiative petition filed by SSA.[1] Among its many challenges to the petition, AHE argued that SSA did not register its paid canvassers as required by law. Specifically, AHE argued that "SSA made no certification that any paid canvasser had passed any background check," and therefore, Thurston erroneously included over 50,000 signatures.[2] *Id.* at 5, 606 S.W.3d at 585.

---

[1]SSA sought to refer Act 579 of 2019 to the people of Arkansas on the November 3, 2020 general-election ballot. Act 579 expanded the scope of the practice of optometry in Arkansas to permit licensed optometrists to perform the following procedures: "(1) '[i]njections, excluding intravenous or intraocular injections'; (2) '[i]ncision and curettage of a chalazion'; (3) '[r]emoval and biopsy of skin lesions with low risk of malignancy, excluding lesions involving the lid margin or nasal to the puncta'; (4) '[l]aser capsulotomy'; and (5) '[l]aser trabeculoplasty.' *See* Ark. Code Ann. § 17-90-101(a)(3)(D)(i)–(v) (Supp. 2019)." *Id.* at 2, 606 S.W.3d at 583.

[2]The following is the certification language at issue in *Healthy Eyes*:

In compliance with Ark. Code Ann. § 7-9-601, please find the list of paid canvassers that will be gathering signatures on the Safe Surgery Referendum. On behalf of the sponsor, this statement and submission of names serves as certification that the statewide Arkansas State Police background check, as well as a 50-state criminal background check, have been timely *acquired* in the 30 days before the first day the paid canvasser begins to collect signatures as required by Act 1104 of 2017.

2

We explained that the plain language of Arkansas Code Annotated section 7-9-601 provides that the sponsor "*shall obtain*" a current state and federal criminal record search and that the criminal record search "shall be obtained within thirty (30) days before the date that the paid canvasser begins collecting signatures." Ark. Code Ann. § 7-9-601(b)(1), (2) (emphasis added). Additionally, the statute provides that the background check is to be completed before the paid-canvasser list is submitted to the Secretary of State and requires the sponsor to "certify to the Secretary of State that each paid canvasser in its employ *has passed* a criminal background check in accordance with this section. Ark. Code Ann. § 7-9-601(b)(3) (emphasis added)." 2020 Ark. 270, at 7, 606 S.W.3d at 586.

Relying on our recent case, *Miller v. Thurston*, 2020 Ark. 267, 605 S.W.3d 255, we explained:

> Miller argued to this court that the certification language, when viewed as a whole, certified that their paid canvassers had passed criminal background checks and that the Secretary violated Arkansas law in declaring the petitions insufficient for failure to comply with the statutory requirements of section 7-9-601. In construing section 7-9-601, we stated that
>
> > [u]nder Arkansas Code Annotated section 7-9-601, a sponsor is required both to obtain a criminal record search on each paid canvasser and to certify to the Secretary of State that each paid canvasser passed the criminal background check. Simply acquiring or obtaining a background check is not sufficient under the plain language of the statute.
> >
> > . . . .
> >
> > [W]e cannot ignore the mandatory statutory language requiring certification that the paid canvassers passed criminal background checks, nor can we disregard section 7-9-601(f)'s prohibition on the Secretary of State counting incorrectly obtained signatures "for any purpose."

*Id.* at 2–3, 606 S.W.3d at 584 (emphasis added).

*Miller*, 2020 Ark. 267, at [7, 9], 605 S.W.3d [at 259–60]. We concluded that a criminal background check must be both "obtain[ed]," pursuant to section 7-9-601(b)(1), and "passed," pursuant to section 7-9-601(b)(3). In *Miller*, we held as a matter of law that the petitioners did not comply with section 7-9-601(b)(3) when they failed to certify that their paid canvassers had passed criminal background checks, that the initiative petitions were insufficient, and that the petitioners were not entitled to a cure period. *Miller*, 2020 Ark. 267, at [9], 605 S.W.3d at 259–60.

*Healthy Eyes*, 2020 Ark. 270, at 8–9, 606 S.W.3d at 587. Thus, we held that *Miller* controls because SSA's certification language failed to certify that the paid canvassers had "passed" a criminal background check in compliance with section 7-9-601(b)(3). *Id.* at 9, 606 S.W.3d at 587. Further, under a strict-compliance analysis, we held that SSA's petition was insufficient for its failure to comply with section 7-9-601(b)(3). *Id.*[3]

We now turn to the facts related to the present case. On September 4, 2020, SSA filed its complaint in the Pulaski County Circuit Court. In the complaint, SSA challenged the constitutionality of certain statutes governing the initiative and referendum process and sought declaratory judgments, a temporary restraining order (TRO), and a preliminary injunction. SSA asserted that it plans to sponsor certain initiatives to appear on the November 2022 ballot. Specifically, in Count 1 and Count 2, SSA sought a declaratory judgment regarding obtaining federal background checks under Arkansas Code Annotated section 7-9-601(b)(1) and (b)(3),

---

[3]We did not reach, in either case, the impossibility of obtaining a federal background check from the Arkansas State Police as required by section 7-9-601(b)(1). Specifically, in *Miller*, we stated, "[Petitioner's] argument that strict compliance is impossible is a red herring, however, because the impossibility of obtaining federal background checks from the Arkansas State Police, as contemplated by the statute, is not at issue. Petitioners did not certify that their paid canvassers had passed any background check—state or federal." 2020 Ark. 267, at 8, 605 S.W.3d at 259.

respectively.[4] SSA argued that section 7-9-601(b)(1) requires sponsors to obtain federal background checks from the Arkansas State Police (the ASP), which is impossible. Thus, SSA argued that subdivision (b)(1)'s requirements regarding background checks from the ASP are unconstitutional and should be enjoined. Subdivision (b)(3) requires sponsors to certify that any paid canvasser they employ "has passed a criminal background check in accordance with this section." Therefore, SSA argued that, based on the impossibility of obtaining a federal criminal record search from the ASP pursuant to subdivision (b)(1), subdivision (b)(3)'s certification requirement is likewise impossible. SSA requested that the circuit court issue a TRO regarding Counts 1 and 2; issue a preliminary injunction on the enforcement of the foregoing statutes; declare that it is impossible for sponsors to comply with Arkansas Code Annotated section 7-9-601(b)(1)'s requirement of obtaining federal background checks from the ASP on their paid canvassers; and declare that, because compliance with section 7-9-601(b)(1) is impossible, it is unconstitutional under amendment 7 for section 7-9-601(b)(3) to require sponsors to certify that their paid canvassers have passed federal background checks from the ASP.

On September 8, 2020, at the request of SSA, the circuit court entered an ex parte TRO. The order enjoined Thurston from enforcing subdivisions (b)(1) and (b)(3) until SSA could be heard at a preliminary injunction hearing. On the same day, the circuit court entered an order scheduling the hearing for September 18, 2020. On September 9, Thurston filed his notice of appeal from the ex parte TRO.

---

[4]Count III involved section 7-9-126 and, as argued below, was not subject to the injunction and is not at issue on appeal.

5

On September 9, in CV-20-532 (appeal of the TRO), the record was lodged in this court and we set a briefing schedule. Thurston also filed an emergency motion for stay of TRO and requested expedited consideration. On the same day, in CV-20-529, Thurston filed an emergency petition for writ of mandamus, writ of prohibition, writ of certiorari, or supervisory writ. Thurston also filed an emergency motion for stay of the TRO and requested expedited consideration.

On September 14, in CV-20-532, SSA filed a motion to dismiss and to stay briefing schedule. On September 16, this court denied the motion to dismiss the appeal and granted a stay of the briefing schedule pending an entry of the circuit court's order granting or denying the preliminary injunction. On the same day, in CV-20-529, we granted expedited consideration; denied the petition; and held that the emergency motion for stay of the TRO was moot.[5]

On September 18, the hearing on the preliminary injunction was held, during which Dr. Laurie Barber, chair of SSA, testified that SSA intends to support an initiated act for the November 2022 ballot. Dr. Barber further testified about the amount of time and expense SSA has dedicated to their efforts over the past two years. When specifically asked if she had any idea how much money it would cost to draft an initiative that would pass muster, Dr. Barber responded, "So far . . . and it failed––we have spent over a million dollars."

SSA presented as exhibits testimony obtained during the special masters' proceedings for *Healthy Eyes*, *supra*, and *Miller*, *supra*. During both hearings, Mary Claire McLaurin, ASP attorney, testified that the ASP does not provide sponsors with federal background checks for their paid

---

[5]On November 10, 2020, in CV-20-532, Thurston filed a motion to dismiss the appeal of the TRO because it had expired on its own terms. We granted the motion on December 3.

canvassers. According to McLaurin, the FBI will not process a federal background check pursuant to the paid-canvassers statute, and the ASP has never provided a sponsor a federal background check under section 7-9-601(b). SSA also submitted as exhibits the special masters' reports filed in the above cases. Both special masters found McLaurin's testimony credible and that compliance with the federal-background-check requirement in subdivision (b)(1) is impossible.

On September 24, 2020, the circuit court entered its order granting SSA's request for preliminary injunction. The order found that the entirety of section 7-9-601(b) is unconstitutional and enjoined Thurston from applying its provisions.

Thurston appeals. As an initial matter, we note that the circuit court's order is not final. Specifically, the order states: "As the Defendants have not yet filed their responses to Plaintiffs' Complaint, as the time for answering the Complaint has not run, the Court reserves a ruling on the prayer for Declaratory Judgment at this time." However, Arkansas Rule of Appellate Procedure–Civil 2(a)(6) allows for an appeal of an "interlocutory order by which an injunction is granted." We have said that this is a distinct basis for appeal from Rule 2(a)(1), which provides for appeals from a "final judgment or decree." *E. Poinsett Cty. Sch. Dist. No. 14 v. Massey*, 317 Ark. 219, 223, 876 S.W.2d 573, 575 (1994). An appeal taken pursuant to Rule 2(a)(6) requires the appellant to file the record within thirty days from the filing of the first notice of appeal. Ark. R. App. P.–Civ. 5(a). Here, the notice of appeal was filed on September 24, 2020, and the record was timely filed on September 28, 2020. Therefore, we have jurisdiction to consider the present case pursuant to Rule 2(a)(6).

*Ark. Code Ann. § 7-9-601(b)*

7

The applicable statute, Arkansas Code Annotated section 7-9-601(b), sets forth the background check and certification requirements that a sponsor must obtain before a paid canvasser collects signatures:

> (b)(1) To verify that there are no criminal offenses on record, a sponsor *shall* obtain, at the sponsor's cost, *from the Division of Arkansas State Police*, a current state and *federal criminal record search* on every paid canvasser to be registered with the Secretary of State.
>
> (2) The criminal record search shall be obtained within thirty (30) days before the date that the paid canvasser begins collecting signatures.
>
> (3) Upon submission of the sponsor's list of paid canvassers to the Secretary of State, the sponsor *shall* certify to the Secretary of State that each paid canvasser in the sponsor's employ *has passed a criminal background check in accordance with this section.*
>
> (4) A willful violation of this section by a sponsor or paid canvasser constitutes a Class A misdemeanor.

(Emphasis added.) We review issues of statutory interpretation de novo, as it is for this court to determine the meaning of a statute. *Dep't of Ark. State Police v. Keech Law Firm, P.A.*, 2017 Ark. 143, 516 S.W.3d 265. The basic rule of statutory construction is to give effect to the intent of the legislature by giving words their usual and ordinary meaning. *Ark. Soil & Water Conservation Comm'n v. City of Bentonville*, 351 Ark. 289, 92 S.W.3d 47 (2002). "When a statute is clear, it is given its plain meaning, and we will not search for legislative intent; rather, that intent must be gathered from the plain meaning of the language used. In other words, if the language of the statute is plain and unambiguous, the analysis need go no further." *Yamaha Motor Corp., U.S.A. v. Richard's Honda Yamaha*, 344 Ark. 44, 52, 38 S.W.3d 356, 360 (2001). This court is very reluctant to interpret a legislative act in a manner contrary to its express language unless it is clear that a drafting error or omission has circumvented legislative intent. *Id.*, 38 S.W.3d at 360.

We construe statutes so that no word is left void, superfluous, or insignificant, and we give meaning to every word in the statute, if possible. *Bedell v. Williams*, 2012 Ark. 75, 386 S.W.3d 493 (citing *Rylwell, L.L.C. v. Ark. Dev. Fin. Auth.*, 372 Ark. 32, 269 S.W.3d 797 (2007)).

## I. *Justiciable Controversy*

For his first point on appeal, Thurston argues that the circuit court lacked jurisdiction to consider SSA's request for a preliminary injunction because SSA did not present a justiciable controversy. Thurston argues that SSA's claim is merely speculative and contingent because it is entirely unknown whether SSA would be prevented from registering paid canvassers for a future initiative, or that a potential roadblock would arise in the 2022 initiative process, which SSA has not yet started. Specifically, Thurston argues that the fact that SSA must comply with section 7-9-601(b) if they choose to engage in the initiative-or-referendum process in the future was insufficient to show that they face a "present danger or dilemma" from the antifraud requirements. To support this argument, Thurston relies on *Baptist Health Systems v. Rutledge*, 2016 Ark. 121, 488 S.W.3d 507. In that case, the Hospital appellants sought a judgment declaring the Arkansas Peer Review Fairness Act unconstitutional. *Id.* at 1–2, 488 S.W.3d at 508. Relying on the Hospitals' references to hypothetical future events, the appellees argued that there was not a justiciable controversy on the basis that there was no present danger or dilemma. *Id.* at 4, 488 S.W.3d at 510. We agreed, noting that the Hospitals did not state that they were violating the Act, nor did they allege a threat of imminent enforcement under the Act. *Id.* We explained that "[w]ithout a sufficient factual record to show an actual, present controversy, this

9

court cannot opine on the merits of the constitutional arguments raised in the Hospitals' declaratory-judgment suit." *Id.* at 5, 488 S.W.3d at 510.

SSA argues that the present case is more properly guided by *Magruder v. Arkansas Game & Fish Commission*, 287 Ark. 343, 698 S.W.2d 299 (1985), and *Jegley v. Picado*, 349 Ark. 600, 80 S.W.3d 332 (2002). In *Magruder*, the appellant challenged an Arkansas Game and Fish Commission regulation that prohibited the taking of black bass under fifteen inches from Lake Maumelle. In holding that the appellant had standing to challenge the regulation, we explained,

> The appellant alleged he was a licensed fisherman who frequently fished Lake Maumelle. Nothing in the record showed the commission challenged that allegation. If the commission's regulation is to be enforced it will have an effect on persons who fish Lake Maumelle regardless of who owns the lake. One whose rights are thus affected by a statute has standing to challenge it on constitutional grounds. The same rule applies to official acts other than statutes and thus it applies to the regulation in question here.

287 Ark. at 344, 698 S.W.2d at 300 (internal citations omitted).

In *Jegley*, the appellees challenged the constitutionality of the sodomy statute. The appellant argued that the appellees could not seek a declaratory judgment regarding the constitutionality of the statute because they had not shown the existence of a justiciable controversy by way of a credible threat of imminent prosecution. 349 Ark. at 611, 80 S.W.3d at 336. We disagreed and explained that "[w]e have not always required prosecution or a specific threat of prosecution as a prerequisite for challenging a statute." *Id.* at 618, 80 S.W.3d at 341. Relying in part on *Magruder*, we found that the justiciable-controversy requirement was satisfied:

> Clearly this statute is not moribund, and the State has not foresworn enforcement of it. Appellees are precisely the individuals against whom section § 5-14-122 is intended to operate. As they admit to presently engaging in behavior that violates the statute and intending to engage in future behavior that violates the law, and as the State has not disavowed any intention of invoking the criminal-penalty provisions of Ark. Code Ann.

10

§ 5-14-122, we cannot say that appellees are without some reason to fear prosecution for violation of the sodomy statute. To hold otherwise would leave appellees trapped in a veritable Catch-22. As long as Arkansas prosecutors exercise their discretion and fail to prosecute those individuals who violate the sodomy statute through consensual, private behavior, appellees and those similarly affected by the statute would have no choice but to suffer the brand of criminal impressed upon them by a potentially unconstitutional law. The discretionary acts of the State's prosecutors could effectively bar shut the courthouse doors and protect the sodomy statute from constitutional challenge. We cannot allow this to happen.

*Id.* at 621–22, 80 S.W.3d at 343 (internal citations omitted).

On appeal, the question as to whether there was a complete absence of a justiciable issue shall be reviewed de novo on the record of the circuit court. *Rutledge*, *supra*. Despite the parties' arguments, we recently decided justiciability in the context of a preliminary injunction. In *City of Jacksonville v. Smith*, this court held as follows:

Here, the circuit court has not ruled on Smith's underlying declaratory-judgment action, but it granted Smith's request for entry of a preliminary injunction. In its order granting preliminary injunction, the circuit court found that Smith had met her burden of establishing both a likelihood of success on the merits of her claims and the existence of irreparable harm in the absence of injunctive relief. This court has stated that "[a] party thus is not required to prove his [or her] case in full at a preliminary-injunction hearing." [*Ark. Dep't of Human Servs. v.* ] *Ledgerwood*, 2017 Ark. 308, at 9, 530 S.W.3d at 342 (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Accordingly, we conclude that Smith presents a justiciable controversy.

2018 Ark. 87, at 7–8, 540 S.W.3d 661, 667. Accordingly, we hold that a justiciable controversy exists in the present case.

II. *Preliminary Injunction*

In determining whether to issue a preliminary injunction pursuant to Arkansas Rule of Civil Procedure 65, the circuit court must consider two things: (1) whether irreparable harm will result in the absence of an injunction, and (2) whether the moving party has demonstrated a

11

likelihood of success on the merits. *Baptist Health v. Murphy*, 365 Ark. 115, 226 S.W.3d 800 (2006). This court reviews the grant of a preliminary injunction under an abuse-of-discretion standard. *Id.* The standard of review is the same for the two essential components of a preliminary injunction: irreparable harm and likelihood of success on the merits. *Id.* There may be factual findings by a circuit court that lead to conclusions of irreparable harm and likelihood of success on the merits, and those findings shall not be set aside unless clearly erroneous, but a conclusion that irreparable harm will result or that the party requesting the injunction is likely to succeed on the merits is subject to review under an abuse-of-discretion standard. *Id.*

When an appeal reaches a court via an order granting a preliminary injunction, the appellate court will not delve into the merits of the case further than is necessary to determine whether the circuit court exceeded its discretion in granting the injunction. *Id.* The sole question before the appellate court is whether the circuit court "departed from the rules and principles of equity in making the order," and not whether the appellate court would have made the order. *Id.* at 121–22, 226 S.W.3d at 806–07.

A. Likelihood of Success on the Merits

Thurston argues that SSA failed to show a likelihood of success on the merits because the antifraud requirements contained in section 7-9-601(b) serve important interests and are well within the General Assembly's authority under amendment 7. Thus, Thurston contends that contrary to the circuit court's novel interpretation of section 7-9-601(b) that sponsors are required to perform an impossible task, compliance may be accomplished in a myriad of ways.

This court has held that "to justify a grant of preliminary injunction relief, a plaintiff must establish that it will likely prevail on the merits at trial." *W.E. Long Co. v. Holsum Baking Co.*, 307 Ark. 345, 351, 820 S.W.2d 440, 443 (1991) (citing *Smith v. Am. Trucking Ass'n*, 300 Ark. 594, 781 S.W.2d 3 (1989)). The test for determining the likelihood of success is whether there is a reasonable probability of success in the litigation. *Custom Microsystems, Inc. v. Blake*, 344 Ark. 536, 42 S.W.3d 453 (2001).

Thurston correctly notes that article 5, section 1 of the Arkansas Constitution, as amended by amendment 7, requires—not merely authorizes—the General Assembly to enact law "prohibiting and penalizing perjury, forgery, and all other felonies or other fraudulent practices, in the securing of signatures or filing of petitions." However, this same section of our constitution also provides protection for the people of Arkansas. Specifically, article 5, section 1 reserves to the people of the State of Arkansas the right to propose legislative measures, laws, and amendments to the constitution, and to enact or reject the same at the polls, independent of the General Assembly, and sets out the procedure for doing so. Section 1 also prohibits unwarranted restrictions, stating that

> [n]o law shall be passed to prohibit any persons or persons from giving or receiving compensation for circulating petitions, nor to prohibit the circulation of petitions, nor in any manner interfering with the freedom of the people in procuring petitions[.]

This section further provides that "[n]o legislation shall be enacted to restrict, hamper or impair the exercise of the rights herein reserved to the people." Ark. Const. art. 5, § 1.

In finding that SSA is likely to succeed on the merits, the circuit court made the following findings:

A sworn affidavit from an attorney for the Arkansas State Police stated that Arkansas State Police cannot obtain and has never obtained a federal background check on paid canvassers under Ark. Code Ann. § 7-9-601(b)(1). The special masters in both proceedings found that it was impossible for sponsors to comply with the federal background check requirement.

The statute's provisions block the Plaintiffs from being able to exercise their initiative and referenda rights under Amendment 7 because the Act created at least two requirements with which compliance is impossible. Such requirements violate Amendment 7's prohibition on laws that interfere "with the freedom of people in procuring petitions" and that "restrict, hamper or impair the exercise of the rights herein reserved to the people."

. . . .

The Court agrees with the Plaintiffs' argument that "it is difficult to imagine a more textbook example of a statute that restricts, hampers, or impairs Arkansas initiative and referenda than one like the federal-background-check requirement with which compliance is impossible."

As noted above, Ark. Code Ann. § 7-9-601(b)(1) and 601(b)(3) are unconstitutional for the same reason: they require sponsors to do the impossible on pain of either committing a crime under Ark. Code Ann. § 7-9-601(b)(4) or having their entire petition set aside for lack of signatures under Ark. Code Ann. § 7-9-601(f).

During the hearing on the preliminary injunction, SSA presented as exhibits testimony obtained during the special masters' proceedings for *Healthy Eyes*, *supra*, and *Miller*, *supra*. As set forth above, during the *Healthy Eyes* hearing, Mary Claire McLaurin, ASP attorney, testified that the ASP does not provide sponsors with federal background checks for their paid canvassers. According to McLaurin, the FBI will not process a federal background check pursuant to the paid-canvassers statute, and the ASP has never provided a sponsor a federal background check under section 7-9-601(b).

During the *Miller* hearing, McLaurin testified that the only background checks the ASP can perform for sponsors seeking background checks on paid canvassers are Arkansas

14

background checks. She explained that even though section 7-9-601(b)(1) states that the background checks shall be obtained from the ASP, "the wording of the statute is not sufficient to grant the . . . sponsors the authority under the FBI, the Department of Justice guidelines." Further, McLaurin testified that there is no way for a sponsor of a statewide initiative or referendum to obtain a federal background check from the ASP.

The circuit court also considered the special masters' reports filed in the above cases. Both special masters found McLaurin's testimony credible and that compliance with the federal-background-check requirement in section 7-9-601(b)(1) is impossible.

Considering the evidence presented at the preliminary-injunction hearing, we cannot say that the circuit court clearly erred in finding it impossible to obtain a federal background check from the ASP. However, our analysis does not end there because Thurston contends that compliance with the antifraud requirements of section 7-9-601(b) is not impossible; rather, it can be accomplished in other ways.

First, Thurston argues that far from finding section 7-9-601(b) impossible to comply with, our straightforward reading in *Miller* is one of the permissible interpretations. Thurston relies on a footnote that states, "[T]he standard for having 'passed'" a criminal background check appears to be having no criminal conviction for a felony offense or a violation of the election laws, fraud, forgery, or identification theft as stated in section 7-9-601(d)(3)." *Id.* at 8 n.4, 605 S.W.3d at 259 n.4.[6] Thus, Thurston contends that a certification to that effect is certainly not impossible for sponsors to provide and would satisfy the antifraud requirements.

---

[6]Section 7-9-601(d)(3) states:

15

When reviewing the precise statute at issue in the present case, we explained that "[t]he first rule in considering the meaning and effect of a statute is to construe it just as it reads, giving the words their ordinary meaning and usually accepted meaning in common language." *Miller*, 2020 Ark. 267, at 7, 605 S.W.3d at 258–59 (quoting *Berryhill v. Synatzske*, 2014 Ark. 169, at 4, 432 S.W.3d 637, 640). We explained that pursuant to section 7-9-601, a sponsor is required both to obtain a criminal record search on each paid canvasser and to certify to the Secretary of State that each paid canvasser passed the criminal background check. *See* Ark. Code Ann. § 7-9-601(b)(1), (b)(3). In an attempt to comply with subdivision (b)(3)'s certification requirement that the canvassers had "passed" the background check, the sponsors certified that criminal background checks had been timely "acquired." We held that this certification was insufficient under that statute and explained that "[s]imply acquiring or obtaining a background check is not sufficient under the plain language of the statute. The results of the background checks are not required to be filed with the Secretary of State, and the certification is the only assurance the public receives that the paid canvassers 'passed' background checks." *Id.* at 7–8, 605 S.W.3d at 259. We then stated that "the standard for having 'passed' a criminal background check appears to be having no criminal conviction for a felony offense or a violation of the election laws, fraud,

---

(d) Before obtaining a signature on an initiative or referendum petition as a paid canvasser, the prospective canvasser shall submit in person or by mail to the sponsor:

. . .

(3) A signed statement taken under oath or solemn affirmation stating that the person has not pleaded guilty or nolo contendere to or been found guilty of a criminal felony offense or a violation of the election laws, fraud, forgery, or identification theft in any state of the United States, the District of Columbia, Puerto Rico, Guam, or any other United States protectorate[.]

forgery, or identification theft as stated in section 7-9-601(d)(3)." *Id.* at 8 n.4, 605 S.W.3d 259 n.4. The petitioners went on to argue that strict compliance with the statute was impossible due to the impossibility of obtaining the federal background checks from the ASP as contemplated by subdivision (b)(1). However, we considered this argument to be a red herring because the petitioners did not certify that their paid canvassers had passed any background check—either state or federal. *Id.* at 8, 605 S.W.3d at 259.

Despite Thurston's arguments to the contrary, having found that the petitioners did not certify that the canvassers had passed any background check, we declined to consider the impossibility of obtaining a federal background check from the ASP. Now with the issue squarely before us, and in construing subdivision (b)(1) just as it reads, it is clear that the federal background check is to be obtained "from the Division of Arkansas State Police." Taking into consideration the testimony above, this is impossible. Further, subdivision (b)(3) mandates that the sponsor shall certify to the Secretary of State that each paid canvasser in the sponsor's employ has passed a criminal background check in accordance with this section. Because subdivision (b)(3) requires the sponsor to certify that the impossible requirement contained in subdivision (b)(1) has been satisfied, it follows that compliance with subdivision (b)(3) is likewise impossible. In light of this determination, a certification consistent with the standard set out in footnote 4 in *Miller* would not suffice.

As an additional means of compliance, Thurston argues that history shows that compliance is not merely theoretical. Thurston argues that since the enactment of section 7-9-601(b) in 2015, initiative sponsors—including SSA—have successfully registered their paid canvassers. Specifically, Thurston notes that in July 2019, SSA certified that they had "obtain[ed]

17

a criminal background check for each paid canvasser in compliance with **§** 7-9-601" for a previous referendum. *Healthy Eyes*, 2020 Ark. 270, at 2, 606 S.W.3d at 584 (noting SSA's certification that "the canvassers listed below have each passed a criminal background check from the Arkansas State Police within 30 days of canvassing"). Thurston argues that this certification was sufficient to meet the statutory requirement, and the signatures collected by canvassers covered by that certification were accepted and counted. *Id.* at 3, 606 S.W.3d at 584.

While this certification may have previously been accepted, as set forth above, we had not yet determined that compliance with section 7-9-601(b)(1) is impossible. Again, given the impossibility of complying with subdivision (b)(1), subdivision (b)(3)'s requirement that "the sponsor shall certify to the Secretary of State that each paid canvasser in the sponsor's employ has passed a criminal background check in accordance with this section" is likewise impossible. Further, despite having registered paid canvassers and collected signatures in the past, according to the plain language of section 7-9-601(b), this was apparently done in violation of the statute as it is impossible to comply with subdivisions (b)(1) and (b)(3).

Next, Thurston argues that in order to "obtain" the necessary background checks from the ASP, the ASP will fingerprint the background-check applicants and then an applicant can submit his or her fingerprints for federal background checks. Thus, Thurston contends that because the ASP plays a critical role in obtaining the federal background check, this is sufficient to satisfy the statute.

Again, in construing subdivision (b)(1) just as it reads, it is clear that the federal background check is to be obtained "from the Division of Arkansas State Police." Accordingly, we disagree with Thurston's position that the ASP's role in fingerprinting background-check

applicants satisfies the statute's requirement that the background check be "obtained" from the ASP.

Having found that subdivisions 601(b)(1) and (b)(3) are impossible to comply with, we hold that the circuit court did not abuse its discretion in determining that SSA demonstrated a likelihood of success on the merits.

## B. Irreparable Harm

Thurston argues that the circuit court erred by finding that irreparable harm will result in the absence of the preliminary injunction. Irreparable harm is "the touchstone of injunctive relief." *United Food & Commercial Workers Int'l Union v. Wal-Mart Stores, Inc.*, 353 Ark. 902, 905–07, 120 S.W.3d 89, 92 (2003) (citing *Wilson v. Pulaski Ass'n of Classroom Teachers*, 330 Ark. 298, 954 S.W.2d 221 (1997) (holding that the prospect of irreparable harm is the foundation of the power to issue injunctive relief)). Further, we have said that harm is normally considered irreparable only when it cannot be adequately compensated by money damages or redressed in a court of law. *AJ & K Operating Co., Inc. v. Smith*, 355 Ark. 510, 140 S.W.3d 475 (2004).

On the issue of irreparable harm, the circuit court found that

> [t]he Plaintiffs presented testimony from Dr. Barber as to the expense and time consuming efforts necessary in exercising initiative and referenda rights. As the impossible requirements found in Ark. Code Ann. § 601(b)(1) and § 601(b)(3) prevent SSA from registering any paid canvassers, SSA cannot begin the initiative process for the 2022 cycle. The Court finds that a preliminary injunction is necessary as otherwise, SSA will be irreparably harmed as money damages will not be a remedy.

We agree with the circuit court's finding that SSA will be irreparably harmed in the absence of a preliminary injunction.

19

Thurston challenges the preliminary-injunction order on multiple grounds related to whether SSA demonstrated irreparable harm. First, Thurston argues that SSA can register paid canvassers even if it is impossible to obtain a federal background check from the ASP. Thurston contends that in previous cases, SSA and others have registered their paid canvassers and collected signatures, and they have offered no evidence that the antifraud provisions have ever prevented them from registering canvassers and collecting signatures.

Despite SSA's having registered paid canvassers and collected signatures in the past, we reject this argument based on the impossibility of compliance with subdivisions (b)(1) and (b)(3) as set forth above.

Second, Thurston argues that the circuit court's finding that SSA cannot begin the initiative process if the antifraud requirements are not enjoined was clearly erroneous. Thurston contends that SSA can take the very first step of the initiative process—filing a draft proposal of their initiative pursuant to section 7-9-107[7]—without having to worry about section 7-9-601(b) compliance. However, as SSA correctly notes, a sponsor must comply with both section 7-9-107 and section 7-9-601 prior to gathering signatures on the petition.[8] Stated differently, even if SSA

[7]Section 7-9-107(a) provides: Before any initiative petition or referendum petition ordering a vote upon any amendment or act shall be circulated for obtaining signatures of petitioners, the sponsors shall file the original draft with the Secretary of State.

[8]Next, Thurston correctly notes that section 7-9-601 regulates the hiring and training of paid canvassers only. Thurston goes on to suggest that SSA could submit their proposal now and begin the petition-circulation process by enlisting the help of volunteer canvassers. SSA responds that the Arkansas Constitution forecloses this argument because it states that the General Assembly cannot pass a law forcing sponsors to use voluntary canvassers instead of paid canvassers: "No law shall be passed to prohibit any person or persons from giving or receiving compensation for circulating petitions, nor to prohibit the circulation of petitions, nor in any manner interfering with the freedom of the people in procuring petitions . . . ." Ark. Const. art.

20

has satisfied section 7-9-107(a) by filing the original draft with the Secretary of State, SSA still cannot begin gathering signatures until it complies with section 7-9-601(b), which is impossible.

Below, SSA presented evidence of irreparable harm through the testimony and affidavit of Dr. Barber. We cannot say that the circuit court's findings regarding Dr. Barber's testimony detailing the time and expense necessary to exercise SSA's initiative and referenda rights were clearly erroneous. Further, the circuit court was correct in its finding that SSA cannot begin the initiative process for the 2022 election cycle because the impossible requirements found in subdivisions (b)(1) and (b)(3) prevent SSA from registering any paid canvassers.

Based on our standard of review, we hold that the circuit court did not abuse its discretion in determining that SSA demonstrated that irreparable harm will result in the absence of an injunction.

## C. Overbroad

Thurston argues that even if the federal-background-check requirement is invalid, the circuit court's preliminary injunction is grossly overbroad. Thurston contends that there is no justification for enjoining the requirement that sponsors obtain state background checks from the ASP or the remainder of the antifraud provisions. Specifically, Thurston argues that section 7-9-601(b)(1)'s requirement that sponsors obtain state background checks is unproblematic and should not have been enjoined. Thurston argues that the circuit court could have stricken "and federal" and retained the state-background-check requirement. Alternatively, Thurston argues

---

5, § 1 ("Unwarranted Restrictions Prohibited"). Despite having raised this issue in his reply brief, Thurston now argues that forcing the sponsors to use volunteer canvassers is a red herring.

that the circuit court could have stricken "from the Division of Arkansas State Police" from the statute and retained "a sponsor shall obtain . . . a current state and federal criminal record search." To support this position, Thurston relies on *Ex parte Levy*, 204 Ark. 657, 163 S.W.2d 529 (1942). In *Levy*, we explained that

> [t]he constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand, though the last fall. The point is, not whether they are contained in the same section, for the distribution into sections is purely artificial, but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must be sustained. . . . If a statute attempts to accomplish two or more objects, and is void as to one, it may still be in every respect complete and valid as to the other. But if its purpose is to accomplish a single object only, and some of its provisions are void, the whole must fail, unless sufficient remains to effect the object without the aid of the invalid portion. And if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other, as to warrant the belief that the Legislature would not pass the residue independently, then, if some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them.

204 Ark. at 659, 163 S.W.2d at 531 (quoting Cooley's Constitutional Limitations 210 (6th ed.)).

SSA responds that the circuit court correctly determined that the impossible federal-background-check requirements of subdivisions (b)(1) and (b)(3) were inseparably linked with the remainder of section 7-9-601(b). To support its position, SSA relies on our standard set forth in *McGhee v. Arkansas State Board of Collection Agencies*, 375 Ark. 52, 289 S.W.3d 18 (2008). In that case, we explained that to determine whether the invalidity of part of an act is fatal to the entire legislation, we look to (1) whether a single purpose is meant to be accomplished by the act and (2) whether the sections of the act are interrelated and dependent upon each other. *Id.*

22

The mere fact that an act contains a severability clause is to be considered but is not alone determinative. *Id.*

As SSA correctly points out, striking just the federal criminal-record search while retaining section 7-9-601(b)'s other requirements regarding a state criminal-record search cannot be consistent with the General Assembly's intent. Section 7-9-601(b) is contained in section 4 of Act 1219 of 2015. The remainder of section 4, codified at section 7-9-601(d)(3), makes clear that the General Assembly was not only concerned with Arkansas convictions but also with convictions in "any state of the United States, the District of Columbia, Puerto Rico, Guam, or any other United States protectorate[.]" Likewise, we reject Thurston's argument that the circuit court could have stricken the requirement that the background checks be obtained "from the Division of Arkansas State Police." Clearly the General Assembly intended for background checks to be obtained from the ASP. Therefore, completely removing the ASP from any involvement runs contrary to the General Assembly's intent.

Next, we consider whether section 7-9-601(b)'s provisions are interrelated and dependent upon each other. In doing so, we have recognized the efficacy of severability clauses when part of an act is unconstitutional but other provisions are valid, and we have had no difficulty in removing words or phrases--or even entire sections--from statutes when those provisions offended constitutional limitations upon legislative action. *Levy*, 204 Ark. 657, 163 S.W.2d 529. If an act is constitutional in part, the valid portion will be sustained if complete in itself and capable of being executed in accordance with the apparent legislative intent. *Id.* The constitutional and unconstitutional provisions may even be contained in the same section. *Id.*

23

If a statute attempts to accomplish two or more objects and is void as to one, it may still be in every respect complete and valid as to the other. *Id.*

While not alone determinative, we note that Act 1219 lacks a severability clause. *McGhee, supra.* Here, a review of section 7-9-601(b)'s subdivisions establishes that they are all related to the criminal background check. Subdivision (b)(1) requires the sponsor to obtain "from the Division of Arkansas State Police, a current state and federal criminal record search on every paid canvasser to be registered with the Secretary of State." Subdivision (b)(2) mandates that the criminal record search shall be obtained within thirty days before the date that the paid canvasser begins collecting signatures. Subdivision (b)(3) requires the sponsor to "certify to the Secretary of State that each paid canvasser in the sponsor's employ has passed a criminal background check in accordance with this section." Subdivision (b)(4) states that a "willful violation of this section by a sponsor or paid canvasser constitutes a Class A misdemeanor." Because all of section 7-9-601(b)'s subdivisions relate to the criminal background check, we hold that they are interrelated and dependent upon each other. Therefore, we disagree with Thurston's position that the circuit court's preliminary injunction was grossly overbroad.

In sum, we cannot say that the circuit court abused its discretion in determining that SSA demonstrated a likelihood of success on the merits and that irreparable harm will result in the absence of an injunction. Accordingly, we affirm.

Affirmed.

*Leslie Rutledge*, Att'y Gen., by: *Nicholas J. Bronni*, Ark. Solicitor Gen.; *Vincent M. Wagner*, Dep. Solicitor Gen.; *Dylan L. Jacobs*, Ass't Solicitor Gen.; and *Emily J. Yu*, Attorney.

*Steel, Wright, and Gray, PLLC,* by: *Alec Gaines* and *Nate Steel,* for appellees.